UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| ANGELA JANELL BURROWS, | § | |
| individually and as independent | § | |
| administrator of, and on behalf of, the | § | |
| ESTATE OF STEPHANIE GONZALES | § | |
| and STEPHANIE GONZALES' heirs-at- | § | |
| law, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 7:20-CV-62 |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| MIDLAND COUNTY, TEXAS; GEORGE | § | |
| DARRELL RHEA; MATTHEW FRANCIS | § | |
| GROESSEL; MONICA MARIE ALLEN; | § | |
| CITY OF MIDLAND, TEXAS; and | § | |
| BLAKE ALLEN BLANSCETT, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **This is a case of a tragic pre-trial prisoner suicide resulting from violation of constitutional rights.  Defendants failed to comply with known jail standards and/or State law, failed to conduct a proper jail intake, and/or ignored Stephanie in her cell while she killed herself.  Defendants' deliberate indifference and objective unreasonableness caused Stephanie's unnecessary suffering and death.**



Table of Contents

I.  Introductory Allegations ...............................................................................4

    A.  Parties ................................................................................................4

    B.  Jurisdiction and Venue......................................................................7

II. Factual Allegations ......................................................................................8

    A.  Introduction.......................................................................................8

    B.  Stefani Gonzales ..............................................................................9

    C.  Stefani's Arrest, Incarceration, and Suicide in the Midland County Jail.........9

        1.  Stefani's June 17, 2018 Arrest and Transport to Jail ...........................9

        2.  Summary of Stefani's Incarceration and Suicide................................16

        3.  Witness Statements ................................................................18

            a   Allen, Monica – Corporal ...................................................18

            b.  Anderson – Corporal........................................................25

            c.  Esquivel, A. – Deputy .....................................................25

            d.  Groessel, Matthew – Jailer................................................25

            e.  Hunnicutt, K. – Jailer ......................................................32

            f.  Rhea, George Darrell – Jailer.............................................33

            g.  Santoyo, A. – Clerk........................................................40

            h.  Stotts, J. – SRU Officer....................................................40

            i.  White, N. – Officer .........................................................40

        4.  Video Evidence ....................................................................41

        5.  Medical Treatment and Death Reports ..............................................43

            a.  Medical Records .............................................................43

            b.  Autopsy – Tarrant County Medical Examiner........................44

            c.  Custodial Death – Midland County Sheriff's Office (Filed with Attorney General) ......................................................44

            d.  Inquest Report – Judge Cobos ..........................................46

    E.  Investigations .................................................................................47

        1.  Midland County ....................................................................47

        2.  Texas Rangers ......................................................................54

        3.  Texas Commission on Jail Standards .............................................54

    F.  Midland County Sheriff's Office Written Policies .........................................59

        1.  Intake Policies and Procedures ......................................................59

|   | 2. | Medical and Mental Health Policies and Procedures | 62 |

| G. | Defendants' Knowledge and Education | 66 |

|   | 1. | Jail Suicides Are a Known Widespread Problem. | 66 |

|   | 2. | Fifth Circuit's Long-Held Constitutional Standard:   Continuous Observation and Monitoring | 67 |

|   | 3. | Individual Defendants' Knowledge, Education, and Background | 72 |

|   |   | a. | Employment Records | 72 |

|   |   |   | (1) | Officer Blake Blanscett | 72 |

|   |   |   | (2) | Corporal Monica Allen | 74 |

|   |   |   | (3) | Jailer Matthew Groessel | 74 |

|   |   |   | (4) | Jailer George Rhea | 75 |

|   |   | b. | TCOLE Records | 81 |

| H. | *Monell* Liability of Midland County and City of Midland | 85 |

|   | 1. | Introduction | 85 |

|   | 2. | Midland County Sheriff's Office Culture | 86 |

|   | 3. | Midland County Liability | 87 |

|   | 4. | City of Midland Liability | 89 |

III. | Causes of Action | 90 |

| A. | 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* | 90 |

| B. | Remedies for Violation of Constitutional Rights and Other Federal Claims | 93 |

| C. | Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process and/or 4th Amendment Rights to Reasonable Mental Health Care, to be Protected, and not to be Punished | 94 |

| D. | Cause of Action Against Midland County and City of Midland Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process and/or 4th Amendment Rights to Reasonable Mental Health Care, to be Protected, and not to be Punished | 98 |

| E. | Causes of Action Against Williamson County and/or City of Midland for Violation of Americans with Disabilities Act and Rehabilitation Act | 100 |

IV. | Concluding Allegations and Prayer | 102 |

| A. | Conditions Precedent | 102 |

| B. | Use of Documents at Trial or Pretrial Proceedings | 102 |

| C. | Jury Demand | 103 |

| D. | Prayer | 103 |

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Angela Burrows ("Angela Burrows" or "Ms. Burrows") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Angela Burrows was Stephanie Gonzales' biological and legal mother. Stephanie Gonzales is referred to herein at times as "Ms. Gonzales" or "Stefani." Angela Burrows sues in her individual capacity and as the Independent Administrator of the Estate of Stephanie Gonzales, Deceased. Angela Burrows, when asserting claims in this lawsuit as the Independent Administrator, does so in that capacity and on behalf of the estate and all of Stefani's heirs  (including Stefani's heirs-at-law, including: Richard Gonzales (husband), Hayden Palacios (son), Mackenzie Clarty (daughter), Madison Flemons (daughter), K. G. (minor son), and K. G. (minor daughter)). All of the people in the immediately preceding sentence, other than Angela Burrows, are collectively referred to herein as the "Claimant Heirs." Angela Burrows asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, Claimant Heirs. Letters of independent administration were issued to Angela Burrows on or about June 17, 2019, in Cause Number 2018-781,953, in the County Court of Lubbock County, Texas, in a case styled *Estate of Stephanie Gonzales, Deceased*.

2.      Defendant Midland County, Texas ("Midland County") is a Texas county. Midland County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Terry Johnson, at 500 N. Loraine Street, Suite 1100, Midland, Texas 79701, or wherever Honorable Judge Johnson may be found. Service on

such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  Midland County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of State law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act).  Midland County's policies, practices, and/or customs were moving forces behind constitutional violations, and resulting damages and death, referenced and asserted in this pleading.

3.      Defendant George Darrell Rhea (sometimes referred to herein as "Mr. Rhea," "Jailer Rhea," or "Receiving Officer Rhea") is a natural person who resides, is domiciled, and may be served with process at 2907 Douglas Drive, Midland, Texas 79701.  Mr. Rhea may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Rhea at Mr. Rhea's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Rhea is being sued in his individual capacity, and he acted at all relevant times under color of State law.  Mr. Rhea was employed by Midland County at all such times and acted or failed to act in the course and scope of his duties for Midland County.

4.      Defendant Matthew Francis Groessel (sometimes referred to herein as "Mr. Groessel," "Jailer Groessel," or "Officer Groessel") is a natural person who resides, is domiciled, and may be served with process at 4001 Pleasant Drive, Midland, Texas 79703.  Mr. Groessel may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Groessel at

Mr. Groessel's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Grossel is being sued in his individual capacity, and he acted at all relevant times under color of State law.  Mr. Groessel was employed by Midland County at all such times and acted or failed to act in the course and scope of his duties for Midland County.

5.      Defendant Monica Marie Allen (sometimes referred to herein as "Ms. Allen," "Jailer Allen," "Officer Allen," or "Corporal Allen") is a natural person who resides, is domiciled, and may be served with process at 1208 Pueblo, Midland, Texas 79705.  Ms. Allen may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Allen at Ms. Allen's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Allen is being sued in her individual capacity, and she acted at all relevant times under color of State law.  Ms. Allen was employed by Midland County at all such times and acted or failed to act in the course and scope of her duties for Midland County.

6.      Defendant Blake Allen Blanscett (sometimes referred to herein as "Mr. Blanscett" or "Officer Blanscett") is a natural person who resides, is domiciled, and may be served with process at 1608 Shell Avenue, Midland, Texas 79705.  Officer Blanscett may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Officer Blanscett at Officer Blanscett's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Officer Blanscett is being sued in his individual capacity, and he acted at all relevant times under color of State law.  Officer Blanscett was employed by City of Midland at all such times and acted or failed to act in the course and scope of his duties for City of Midland.  All natural person Defendants (George Darrell Rhea, Matthew Francis Groessel, Monica Marie Allen, and Blake

Allen Blanscett) in this case are collectively referred to in this complaint as the "Individual Defendants."

7.      Defendant City of Midland, Texas ("City of Midland") is a Texas incorporated municipality/city.  City of Midland may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer.  The identify of City of Midland's chief executive officer is determined by City of Midland's decision to use the council-manager form of government.  As a result, City of Midland's chief executive officer is City Manager Courtney Sharp.  City Manager Courtney Sharp may be served with process at City Hall, 300 N. Loraine, Midland, Texas 79701, or wherever City Manager Sharp may be found.  City of Midland may also be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving it in the manner prescribed by Texas State law for serving a summons or like process (a citation in Texas State courts) on such a Defendant.  Texas Civil Practice and Remedies Code 17.024(b) reads, "In a suit against an incorporated city, town, or village, citation may be served on the mayor, clerk, secretary, or treasurer."  Therefore, City of Midland may be served with process by serving its mayor, clerk, secretary, or treasurer wherever any such person may be found.  City of Midland acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, and/or police officers, all of whom acted under color of State law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act).

B.      Jurisdiction and Venue

8.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant

to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and the following federal statutes: 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

9.      The court has personal jurisdiction over Midland County because it is a Texas county.  The court has personal jurisdiction over City of Midland because it is a Texas municipality.  The court has personal jurisdiction over the Individual Defendants because they reside and are domiciled in, and are citizens of, Texas.

10.      Venue is proper in the Midland-Odessa Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Midland County, which is in the Midland-Odessa division of the United States District Court for the Western District of Texas.

## II.      Factual Allegations

### A.      Introduction

11.      Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors.

B.      Stefani Gonzales

12.      Stefani was born in 1981 in Childress, Texas.  Stefani was only 36 years old at the time of her tragic and unnecessary death, and she was survived by a number of family members.

C.      Stefani's Arrest, Incarceration, and Suicide in the Midland County Jail

13.      Stefani suffered a tragic, completely unnecessary death in the Midland County jail. Individual Defendants' deliberate indifference, and objective unreasonableness in their actions and inaction, caused, was a proximate cause, and was a producing cause of Stefani's suffering and death.

1.      Stefani's June 17, 2018 Arrest and Transport to Jail

14.      Midland Police Department Officer Blake Blanscett arrested Stefani on June 17, 2018.  Plaintiff's counsel obtained certain documents related to that arrest through one or more Public Information Act requests before filing suit.  A document received by Plaintiff's counsel, providing a narrative description of the arrest, was significantly redacted.

15.      The report indicates that, on Sunday, June 17, 2018, at approximately 6:40 p.m., Officer Blanscett was dispatched to a "check person call" at the Resthaven cemetery on North Big Spring Street in Midland.  Dispatch advised Officer Blanscett that a white female with red hair (Stefani) was walking in the middle of the roadway.  It was apparent to any observer that Stefani was a danger to herself and others at the time.  When Officer Blanscett arrived in the area, he noticed Stefani in front of the Stripes convenience store located at 4508 North Big Spring Street. He then parked his patrol unit and made contact with Stefani.

16.      The report is redacted at this point in time, but the next unredacted sentence reads, "Stephanie's speech was very slurred and seemed very lost."  Officer Blanscett directed Stefani to move to the side of the store, so that they could converse more easily away from the noisy traffic. This supported that Stefani was close to or intended to walk into busy traffic.

17.     Officer Blanscett wrote, "While walking to my unit Stefanie was stumbling all over the place."  It was thus apparent to Officer Blanscett that Stefani could not be left alone, to her own devices.  Also, upon information and belief, allegations of Individual Defendants and others in this complaint about Stefani's ability to easily communicate in a straightforward manner after arriving at the Midland County jail are untrue.

18.     The narrative section was substantially redacted.  Officer Blanscett wrote that Stefani told him that she had taken Xanax pills – approximately 10 that day.  Upon information and belief, this indicated to Officer Blanscett that Stefani was taking more medication than any reasonable person would take to treat issues treated by Xanax – anxiety disorders, panic disorders, and anxiety caused by depression.  Instead, it was apparent to Officer Blanscett that Stefani was making an outcry as to her intent to attempt to commit suicide.

19.     Officer Blanscett placed Stefani under arrest for public intoxication, noting that Stefani was a danger to herself.  This is one of the elements required for a public intoxication offense – that a person may be a danger to herself or others.  Officer Blanscett ended the narrative section by writing, "Later in the night around 2200 hours I was made aware that Stephanie had committed suicide in her cell after I had booked her in.  No further."  This would have been no surprise to Officer Blanscett, as Stefani's demeanor, her walking in the middle of the busy roadway, her psychological history communicated to Officer Blanscett, by Stefani, and her indication that she had taken 10 Xanax pills that day clearly showed Officer Blanscett that Stefani intended to kill herself.

20.     The redactions appear to have been made by City of Midland not for any privacy or other legally-required reasons, but instead to try to avoid liability for Stefani's death.  City of Midland also violated or facilitated violation of the Texas Public Information Act in response to a

request by Plaintiff's counsel, evidenced by Officer Blanscett calling Plaintiff's counsel's office

and asking why Plaintiff's counsel was seeking records about him.  Regardless, the following

quotation is portions that were redacted from Officer Blanscett's report mentioned elsewhere in

this pleading.

> I advised Stephanie the reason for the contact and asked if everything was ok.
> Stephanie advised she was feeling depressed but did not specify a reason why upon
> me asking. I asked Stephanie if she was suicidal, which she advised she was not.  I
> asked Stephanie why she was walking in the middle of the roadway, which she
> could not specify a reason why. . . . I asked Stephanie if she had taken any type of
> narcotics or any type of alcoholic beverage that would justify her reason for walking
> in the middle of the roadway, along with her slurred speech and unbalanced
> walking. . . . I asked her how many pills she had taken today, which . . . I asked
> Stephanie if she lived in Midland. She advised she lives in Hollis, Oklahoma and
> nowhere near Midland. . . . I then placed Stephanie into handcuffs which were
> double locked and placed her in the back of my patrol unit. . . . While driving to
> CDC I asked Stephanie if she was diagnosed anything for the screening sheet at the
> jail. Stephanie advised that she has PTSD, Bipolar, and depression. I then asked if
> she was suicidal in the past 90 days, which she advised she was not. Upon arrival
> at CDC Stephanie was booked in. Body cam as well as in-car video and audio was
> uploaded and is available.

21.     When Officer Blanscett arrived at the Midland County Detention Center to transfer

custody of Stefani, upon information and belief, he completed the Midland County Central

Detention Center Screening Form for Suicide and Mental Impairments.  While the form is typed,

it indicates that the completing officer was "B. Blanscett," and the agency was "Midland Police

Dept."

# MIDLAND COUNTY CENTRAL DETENTION CENTER
## SCREENING FORM FOR SUICIDE AND MENTAL IMPAIRMENTS

PRISONER NAME:   **STEPHANIE ANN GONZALES**          DATE OF BIRTH.

STATE I.D. NUMBER (IF KNOWN):   **TX - 28218526**

DATE:   **June 17, 2018**          COMPLETED BY:   **B. BLANSCETT**

Does the arresting officer or any other person have reasonable cause to believe that the defendant committed to the sheriff's custody has a **MEDICAL CONDITION, MENTAL ILLNESS, MENTAL RETARDATION, OR SUICIDE CONCERN?**   ☐ YES  ☑ NO

COMMENTS:   **DIAGNOSED WITH PTSD, BIPOLAR, AND DEPRESSION**

SELF-REPORT QUESTIONS (PLEASE ELEBORATE AS NEEDED)

Are there any current medical problems, recent hospitalizations or serious injuries or concerns about withdrawl?   ☐ YES  ☑ NO

Medications:  ☐ YES  ☑ NO

Have you received services for mental health or mental retardation?   ☐ YES  ☑ NO

Additional comments below.

SUBJECT ADVISED SHE IS DIAGNOSED WITH PTSD, BIPOLAR DISORDER AND DEPRESSION AND WOULD LIKE AN ISOLATED CELL.

To comply with CCP Art. 16.22, this form is completed for each inmate and provided with the arrest paperwork.

| **B. BLANSCETT** | **MIDLAND POLICE DEPT.** | **P528** |
|---|---|---|
| OFFICER | AGENCY | UNIT NUMBER |

6747

22.     Further, upon information and belief, that form required Officer Blanscett to answer the following question: "Does the arresting officer or any other person have reasonable cause to believe that the defendant committed to the sheriff's custody has a **MEDICAL CONDITION, MENTAL ILLNESS, MENTAL RETARDATION, OR SUICIDE CONCERN?**"   Officer Blanscett checked "No."  He knew that such response was false based upon his interaction with Stefani and information he learned and which is referenced in this complaint.  The fact that his response was false is further supported by what he, upon information and belief, typed into the comments section and/or affirmed when he allowed his name to be placed at the bottom of the form: **"SUBJECT ADVISED IS DIAGNOSED WITH PTSD, BIPOLAR DISORDER AND DEPRESSION AND WOULD LIKE AN ISOLATED CELL."**  It was clear that, when Stefani requested an isolated cell, in conjunction with taking an overdose of Xanax, being diagnosed with PTSD, being diagnosed as being bipolar, being diagnosed as being depressed, and walking in the street, Stefani was looking for an isolated cell so she could finish what she attempted to do during the day – commit suicide.

23.     Officer Blanscett also falsely checked the "No" box next to medications or, in the alternative, by allowing his name to be placed on the form, affirmed that the response was true. He clearly knew that Stefani indicated that she had overdosed on Xanax by taking ten pills during the day.  Every law enforcement officer and jailer would know that taking ten Xanax pills would be well above any prescribed dosage.

24.     Officer Blanscett also falsely checked the "NO" box in response to the question, "Are there any current medical problems, recent hospitalizations or serious injuries or concerns about withdrawal?"  As described by Corporal Allen in her statement, referenced elsewhere in this complaint, both Corporal Allen and Officer Blanscett saw a hospital bracelet on Stefani from her

hospitalization the day before. This is yet another reason why Officer Blanscett should have taken Stefani immediately to an appropriate mental health facility. Warning bells had to be going off in Officer Blanscett's head as to Stefani committing suicide.

25.     Texas law was clear in requiring Officer Blanscett to take Stefani to an appropriate mental health facility, rather than transporting her to the Midland County jail. The Texas Health and Safety Code, specifically Chapter 573, entitled "Emergency Detention," is unambiguous regarding duties of a peace officer who comes in contact with a person with mental illness and who, as a result, is at a substantial risk of harm unless the person is immediately restrained. Section 573.001 reads that a peace officer may take a person into custody, without a warrant, if the peace officer has reason to believe and does believe that (1) the person is a person with mental illness; and (2) because of the mental illness there is substantial risk of serious harm to the person or to others unless the person is immediately restrained, and there is insufficient time to obtain a warrant before taking the person into custody. The section indicates that a substantial risk of serious harm to such a person may be demonstrated either by the person's behavior, or by evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty. The section also indicates that a peace officer may form the belief that the person meets the criteria for apprehension on the basis of the apprehended person's conduct, or the circumstances under which the apprehended person is found.

26.     Chapter 573 also reads, explicitly, that a peace office who takes such a person into custody "shall immediately:"

Transport the apprehended person to:

- The nearest appropriate inpatient mental health facility; or

- A mental health facility deemed suitable by the local mental health authority, if an appropriate inpatient mental health facility is not available.

Further: "A jail or similar detention facility may not be deemed suitable except in an **extreme emergency**." (Emphasis added).

27.     There is no doubt that Officer Blanscett was faced with the situation described by Chapter 573.  He heard about Stefani walking in the middle of a roadway. Stefani told Officer Blanscett that she had taken 10 Xanax pills that day, had PTSD, was bi-polar, and was depressed. Those comments, taken together with her walking in the roadway, the medical bracelet on her arm, and other information referenced in this pleading, clearly evidenced to any person, including all reasonable police officers, that Stefani had a mental illness resulting in not only a substantial risk of serious harm to her, but her apparent intent to commit suicide.

28.     Upon information and belief, Officer Blanscett was fully aware of Chapter 573 and his obligation to transport Stefani to an appropriate mental health facility. Moreover, information and belief, Officer Blanscett was clearly aware that the statement about Stefani indicating that she had taken 10 Xanax that day was a statement indicating she had intended to overdose on the drug and further harm herself. Considering other facts in this pleading, Officer Blanscett was deliberately indifferent to, and acted in an objectively unreasonable manner regarding, Stefani's serious mental health needs. Instead of complying with the law, and providing constitutional protection to Stefani, Officer Blanscett took Stefani to the one location to which he should not have taken her – the Midland County jail.

29.     Chapter 573 clearly and unambiguously requires peace officers not to take a person in Stefani's situation to a local jail "except in an extreme emergency." There was no "extreme emergency" requiring Officer Blanscett to take Stefani to the jail, at which she ultimately committed suicide within a very short period of time.

30.     In the alternative, to the extent evidence indicates other than what Plaintiff expects the evidence will indicate after further discovery, if Officer Blanscett was unaware of Chapter 573 or had not been trained  about Chapter 573 nor how to handle mentally ill people such as Stefani, this would be an independent basis for a *Monell* claim against City of Midland. In such a case, City of Midland would not have appropriately supervised Officer Blanscett, allowing him to act on his own regard in Stefani and people in her situation, and likewise would not have trained him for one of the most basic scenarios which he would face in the field. Nevertheless, even if Officer Blanscett had not been trained about Chapter 573 or sufficiently supervised, based upon his interaction with Stefani, it was clear that she did not need to be taken to a jail, but instead to an appropriate mental health facility.  Officer Blanscett's failure to do so was objectively unreasonable and deliberately indifferent to Stefani's constitutional rights.

## 2.     Summary of Stefani's Incarceration and Suicide

31.     General details regarding Stefani's incarceration and suicide are set forth below, in the form of summaries of statements of persons involved, and referenced documents.  Thus, this portion of the pleading provides just a general summary of some events.

32.     As shown elsewhere in this pleading, when Stefani arrived at the Midland County jail, Corporal Allen would not initially accept her as a prisoner.  Corporal Allen was concerned that Stefani had ingested ten Xanax and was thus suicidal.  Therefore, Corporal Allen caused a registered nurse to consult with Stefani.

33.     Registered nurse Amanda Marshall, at the Midland County jail, wrote a summary of her interaction with Stefani.  Nurse Marshall wrote, regarding her initial interaction with Stefani:

> Called to booking around 1900, advised PT had taken some Xanax.  When questioned, she stated "Yes, I take Xanax."  When asked how many, she stated "10, not at once, it was throughout the day.  I take it every day."  Asked again if she took a handful of pills . . . she stated "no, it wasn't at once" PT was alert & answered

questions directly.  Asked if I could take her handcuffs off, motioned to officer &
stated he was the one that did that.  Notified CPL what she stated.

34.     Upon information and belief, Nurse Marshall knew that a typical prescription for
Xanax would not allow a person to take ten pills throughout the day.  It would make little sense,
assuming a 10-hour period of time, for a person to take a Xanax once an hour.  Thus, upon
information and belief, it was unreasonable and deliberately indifferent for Nurse Marshall to
allow Stefani to remain at the facility without immediate mental health treatment.  Likewise, since,
upon information and belief, Corporal Allen knew of the cursory interaction between Nurse
Marshall and Stefani, Corporal Allen could not rely on Nurse Marshall's determination as being
in fact a medical opinion.  All laypersons such as Corporal Allen, as such laity relates to medical
and/or mental health knowledge, would know that Nurse Marshall did not in fact conduct an
appropriate evaluation of Stefani.

35.     Jail staff also performed a CCQ query regarding Stefani.  A CCQ query informs a
jail as to whether an arrestee has likely received mental health care.  The Midland County jail
received a match, indicating that Stefani had received care from West Texas Centers.  This would
indicate to Individual Defendants and anyone else working at the jail that Stefani had received
mental health treatment at West Texas Centers for MHMR.  This was yet another red flag
indicating that Stefani needed immediate inpatient mental health treatment and not to be
incarcerated in the Midland County jail.  Upon information and belief, Corporal Allen was the
Midland County employee who obtained the CCQ information.

36.     As shown elsewhere in this pleading, Corporal Allen ultimately changed out
Stefani's clothing and allowed her to be placed into a cell – alone – with jail-issued clothing which
was not designed for a suicidal person.  After Corporal Allen put Stefani into such a cell, other
Midland County Individual Defendants did virtually nothing for a lengthy period of time.  They

neither complied with 30-minute face-to-face observation standards and/or policies, or a similar

15-minute face-to-face observation policy.  Instead, all Midland County Individual Defendants

chose to allow Stefani to remain in a cell – alone – for over an hour while Stefani committed

suicide using her jail-issued pants.

37.     Thus, which was a surprise to no one, only approximately two-and-a-half hours

(according to Nurse Marshall) after Nurse Marshall initially spoke with Stefani, Nurse Marshall

was called to a medical emergency in booking.  Nurse Marshall wrote:

> Around 2130, I Amanda Marshall, RN was called to a medical emergency in
> booking while in G block passing meds.  Notified that the PT had strangled herself
> with her pants.  CPR was in progress upon arrival & was continued by this nurse
> with the officers assistence.  Requested officers to bring AED & Ambu bag . . .
> oxygen tank.  AED initiated & rescue breaths given via Ambu bag give via Ambu
> bag . . . continuous 2 person CPR.  CPR was continued until EMS arrived.  EMS
> took over situation upon arrival, PT was loaded onto stretcher and transferred
> offsite via EMS.

Stefani had committed suicide.  Individual Defendants had acted objectively unreasonably and

been deliberately indifferent to Stefani's known serious mental health and self-harm tendencies.

Thus, Individual Defendants' actions and inaction caused, were proximate causes of, and were

producing causes of all damages asserted in this pleading, including Stefani's death.

### 3.     Witness Statements

#### a     Allen, Monica – Corporal

38.     Corporal Monica Allen gave a statement to Investigator Chavez and Texas Ranger

Sanchez.  Her statement began at approximately 12:53 a.m. on June 18, 2018.  Corporal Allen said

that she was Corporal of the B shift booking.  She indicated that her duties were to supervise her

officers and to make sure that everything was running smoothly and correctly.  She said that

supervisors were supposed to be in the back watching everyone but, due to being short-handed,

she was at Booking One.  She said that she was at Booking One at the time Officer Groessel called

for a medical emergency after Stefani had committed suicide.  She offered no real defense or excuse, other than what is stated above, as to why she was not involved at all with Stefani after putting her into the cell in which she committed suicide.  She described attempts to revive Stefani, and what was found in the cell, after jailer Groessel found Stefani.  She confirmed that Stefani had used jail-issued pants to form a ligature and commit suicide.

39.     Corporal Allen admitted that she was the person who assisted Stefani in changing into her jail clothing.  She said that she had "medical" check Stefani out before being received, Officer Blanscett told Corporal Allen that Stefani had taken "like five or ten Xanax."  Corporal Allen then said, "Whoa. Okay. Well, hold on. I'm not taking her."  She said that she then said, "let me go get a nurse to evaluate her first cause. . . . I mean, did you take her to the hospital?" Corporal Allen then said that Officer Blanscett then said, "No." Corporal Allen said that she then looked at Stefani and noticed the hospital bracelet. She said that she then asked Officer Blanscett, "You didn't take her?" Corporal said that he then responded, "No. That . . ." She said that Officer Blanscett told Corporal Allen that the bracelet was from three days ago. Corporal Allen then said that she told Officer Blanscett, "Okay. Well, let me get the nurse first. I can't accept her."

40.     It was clear from interaction between Corporal Allen and Officer Blanscett that both realized that Stefani needed immediate health care.  Corporal Allen, when hearing that Stefani had taken "like 5 or 10 Xanax" responded with shock: "Whoa. Okay.  Well, hold on.  I'm not taking her."  This was yet another clear indicator to Officer Blanscett that he needed not to leave Stefani in a jail, where she would not be receiving immediate mental health inpatient treatment, but to take her to the nearest inpatient mental health facility in accordance with Texas law.  There was no "extreme emergency," as referenced in the applicable Texas statute, requiring Officer Blanscett to leave Stefani at the jail.

41.     Further, Corporal Allen cannot rely on the discussion between a jail nurse and Stefani to avoid liability for Stefani's suicide.  A nurse, and more specifically the nurse in this case, who questions a person about taking Xanax only, and who does not discuss any other factors regarding self-harm tendencies referenced in this pleading, has not even conducted a medical, psychological, or mental health examination.  Thus, when Corporal Allen learned of and/or observed the cursory discussion, upon information and belief, she realized that she could not rely on it when admitting Stefani to the jail and moreover personally putting her into a cell with pants with which she could hang herself.

42.     Corporal Allen said that the nurse came and spoke to Stefani. Allegedly, Stefani told the nurse that she had taken ten Xanax throughout the day. Corporal Allen said that Stefani was "feeling sleepy, but for the most part, she was coherent. She was able to stand up, go, follow commands." She also said that Stefani was able to take her own clothes off by herself and change into the jail clothing without assistance. Corporal Allen also said that she did not have any difficulties with Stefani. She did say that Stefani "kinda stumbled a little" when she took off her clothes. Corporal Allen also said that Stefani told Corporal Allen that Stefani's boyfriend had been yelling at her all day.  Corporal Allen's description of Stefani seems to indicate that Stefani could answer questions at intake.  This is in stark contrast to other descriptions of Stefani referenced in this pleading, provided by one or more other Individual Defendants.

43.     Corporal Allen's description of Stefani has nothing to do with whether Stefani intended to commit suicide, other than the description of Stefani's physical reactions to one or more substances which she had apparently taken.  Corporal Allen had information that one such substance would have been Xanax, and that the number of Xanax pills taken that day exceeded that which Corporal Allen was comfortable accepting when deciding whether to admit Stefani to

the jail.   Moreover, it is common knowledge that someone admitted to a jail setting after a significant domestic dispute is at a higher likelihood of self-harm.  Thus, when Corporal Allen learned about Stefani alleging that her boyfriend had been "yelling at her all day," she added this to all of the other information she had received about Stefani.  Corporal Allen knew that Stefani was at a serious risk of committing suicide.  However, Corporal Allen did nothing.  She certainly could not rely on the cursory questions made by a nurse, which could have been asked by Corporal Allen herself as a layperson.  The nurse provided no specialized questions or care and thus did not conduct a medical and/or mental health evaluation.

44.     Upon information and belief, Corporal Allen completed the Receiving Property Inventory form after searching Stefani and requiring her to change into jail-issued clothing.

Holdover _____

**Midland County Sheriff's Office**
Detention Division
**Receiving Property Inventory**

Name# _____
Booking# _____

Inmate's Name  Garales, Stephanie

Address _____  DOB ▮▮▮▮▮▮▮

Property Bag # __567__        Pat Searched By:  CPL ALLEN

Cash Receipt # 32183069      Date & Time: 6/17/18   20:13

Currency $_____   Cks. $_____   Change $_____   Total $ 2.08

### PROPERTY LIST

| | | |
|---|---|---|
| | Coat/Jacket/Sweater | 2 Glasses: both shades |
| | ~~Pants:~~ shorts, gray·red | 1 Bracelet: thin gray |
| | Shirt: black | 5 Earrings: various |
| Dr | Shoes/Boots: black | Necklace: |
| Pr | Socks: white | 1 Rings: large pink / 3 others |
| 1 | Undergarment: beige bra | 1 Watch: Tray |
| | Belt: | Keys: |
| 1/1 | Billfold/Purse: black  black | Knife: |
| 1 | Comb/Brush: pink | Check Bk:_____ thru |
| | Cap/Hat: | 3 Credit Card: 2 MC   1 VISA |
| | Cigarettes/Lighter : | 1 I.D. Card: OKLAHOMA DL |

**OTHER PROPERTY:** 2 piercings - black     cellphone , black
phone battery    charger      white cord      ~~FIE brush~~
2 foreign coins     4 notepads      white pouch

I acknowledge that the above noted property was taken from me during the receiving process at Midland County Detention Facility.

X _____

_____          _____
Inmate Acknowledgement                    Inmate Refused To Sign (Witness)

Receiving Officer: _____

****ANY KNOWN FOOD ALLERGIES: _____ LATEX: _____ OTHER: _____ ******

### PHONE CALLS

Upon being received all inmates must be given the opportunity to make two completed phone calls. Log these phone calls and all attempts given with Time, Date, Name of person called, and the Officer's Name and Call number who completed this task. These will be added into **JMJLOG** during the booking process by the jail clerks.

Name:_____   Phone:_____   Date/Time:_____
Officer:_____

Name:_____   Phone:_____   Date/Time:_____
Officer:_____

Original - Inmates File
CC: - Inmate's Property Bag
BKG-1009  REV –11/08/17

45.     The property list does not include a pill bottle, pills, physician's prescription, or any other item indicating that Stefani had been prescribed Xanax.  It would have made little sense to Corporal Allen, or any reasonable jailer, that a person who alleged to have taken ten Xanax throughout a day would have no physical evidence on her person of such a prescription and/or of such medication.  This was yet another "red flag" to Corporal Allen indicating that Stefani needed to be taken to the nearest inpatient mental health facility.

46.     Corporal Allen also typed a statement into a Midland County Sheriff's Office report.  In that statement, Corporal Allen admitted that she was "stationed at Booking One when [she] saw Office Groessel conducting his jail security check when he had stopped at the detox C cell to check on inmate Gonzales, Stefani . . . ."  Therefore, Corporal Allen was close enough to Stefani's cell to have intervened, and to have conducted her own cell checks, during the time Stefani was incarcerated.  Corporal Allen also indicated in her statement that she observed Jailer Groessel going into Stefani's cell, and then running back to the cell door asking for medical assistance as soon as possible.  It was then, according to Corporal Allen's statement, that Corporal Allen called a medical emergency.

47.     Corporal Allen was admittedly in charge.  It was her responsibility to assure that Stefani, if she was to be incarcerated in a jail cell alone, was continuously monitored and moreover was not provided with clothing or other items with which she could harm herself.  It only takes a few minutes, significantly less than ten minutes, for a person to asphyxiate himself or herself in a jail cell.  Unfortunately, it happens all the time.  Corporal Allen knew this, and she took no precautions for Stefani.  Not only did she not assure continuous monitoring.  She did not assure any monitoring at all.  She allowed Stefani to be put into a cell and ignored, for well over an hour,

so that Stefani could commit suicide.  This was a violation of every known jail standard, including minimum standards imposed by the Texas Commission on Jail Standards.

48.     Corporal Allen also typed into her statement that, upon entering Stefani's cell, she witnessed Jailer Groessel holding up Stefani while Stefani had her orange booking pants wrapped around her neck and tied to what Corporal Allen at the time observed to be an unknown location on the cell sink.  Thus, undisputedly, Stefani was provided with clothing with which she was able to asphyxiate herself.  Suicide clothing, sometimes referred to as a suicide smock, was readily available and should have been used with Stefani if Individual Defendants chose to incarcerate her in a jail cell.  Providing to Stefani clothing with which she could hang or asphyxiate herself was deliberate indifference to her known serious mental health issues.

49.     Corporal Allen also typed into her statement that she had been handed the booking security keys by Jailer Groessel.  Thus, Jailer Groessel literally had the ability to unlock Stefani's cell and save her life had he chosen to do so and not instead been deliberately indifferent.

50.     Corporal Allen also typed into her statement that she instructed Jailer Groessel to do a jail security check after Stefani had been discovered, as well as a head count of inmates in booking.  This made it clear that Corporal Allen was in charge of the booking area and other Individual Defendants working at the Midland County jail at the time of the incident.

51.     Finally, Corporal Allen indicated that paramedics asked for Stefani's name and birthdate.  Corporal Allen was able to provide Stefani's name, but she indicated that she had to go back to the desk to retrieve Stefani's date of birth.  Therefore, upon information and belief, all Individual Defendants who worked for Midland County had access to intake records for Stefani.  Thus, upon information and belief, all such persons knew that the Screening Form for Suicide and Medical/Mental/Development Impairments had not been completed.

### b.        Anderson – Corporal

52.      Corporal Anderson typed a supplemental narrative regarding Stefani's death. Corporal Anderson wrote that he/she was on duty in uniform stationed in the Midland County Detention Center.   Corporal Anderson wrote that, at approximately 21:28, Corporal Allen, stationed as Booking Supervisor, called via radio "medical emergency in booking."   Corporal Anderson indicated that he/she had been relieving Officer White in Master Control and immediately began opening doors to respond.  Upon information and belief, the person working in Master Control had the ability to see on a computer screen Stefani in her cell, and moreover to see that she was committing suicide.  However, upon information and belief, Midland County custom, practice, and/or policy did not require such viewing.

### c.        Esquivel, A. – Deputy

53.      Deputy Esquivel indicated in a supplemental narrative that the deputy was on duty assigned to B-shift, A and B block, on June 17, 2018.  Deputy Esquivel wrote that, at 21:28 hours, a medical emergency in booking was transmitted through the deputy's block-issued radio.   At some point, after arriving in booking, Deputy Esquivel radioed for Master Control which was, according to Deputy Esquivel, manned by Officer White, N.  Upon information and belief, the person working in Master Control had the ability to see on a computer screen Stefani in her cell, and moreover to see that she was committing suicide.  However, upon information and belief, Midland County custom, practice, and/or policy did not require such viewing.

### d.        Groessel, Matthew – Jailer

54.      Investigator Chavez and Ranger Sanchez interviewed Jailer Groessel. That interview began at approximately 12:37 a.m. on June 18, 2018. Jailer Groessel said that he was assigned to "What's called booking security" that night. He said that is the officer that maintains the booking area and custody of the inmates that are already located n the booking area. He said

that the shift was "going on like normal." He knew that Stefani had been received, through the Midland Police Department, and that she had been arrested for public intoxication. He said that she was taken to the detox cell. He also said that she was eating in the cell a sack lunch that she was given. He also said that he was doing cell checks and "she seemed fine until" about 9:27 p.m.

55.     Jailer Groessel's allegation that he was doing cell checks in the booking area, which would include the cell in which Stefani was incarcerated, was false to the extent it implied that he actually made face-to-face observations of inmates as required by Texas Commission on Jail Standards' minimum standards and/or accepted jail practices across the United States.  Instead, he would simply walk by doors, sometimes looking into viewing windows, to do what he referenced as "cell checks."  Upon information and belief, Corporal Allen not only observed Jailer Groessel performing purported checks in such a manner, she approved of it.  Further, upon information and belief, she approved of it because it was an accepted custom in the Midland County jail to conduct checks in such a manner.  Thus, based upon Corporal Allen's knowledge as referenced elsewhere in this pleading, she has independent liability as a supervisor failing to supervise Jailer Groessel and other Individual Defendants working at the Midland County jail.  That failure, as she knew based upon other knowledge that she possessed, resulted in Stefani's death.

56.     Jailer Groessel said that he got up to do a cell check around the jail and went up to the cell and did not see her.  He said that was the point at which he entered into the cell and looked around the partition adjacent to the toilet area.  This was far too late for Stefani, who had committed suicide sometime earlier.  She had been left alone in the cell for over an hour, unobserved, but apparently consistent with Midland County customs and practices.  As Jailer Groessel looked behind the wall, he saw Stefani on her knees, in a slouched position, on the ground right next to the toilet, with one end of the pants wrapped around her neck and the other end wrapped around a

hand rail next to the toilet.  He acknowledged that when he saw her, he knew that she had passed away.  If Individual Defendants working at the jail had actually conducted face-to-face checks of Stefani, and done so in a continuous and consistent manner, Stefani would not have died.  Moreover, Stefani would not have died if Officer Blanscett had taken her to the nearest inpatient mental health facility as required by Texas law and constitutional standards.

57.     Jailer Groessel said that Stefani had been put into the cell, based upon his recollection, somewhere around 8:20 p.m. or 8:30 p.m.  He also indicated that Corporal Allen was the person who put Stefani into that cell.  He said that Stefani seemed tired when she was being put into the cell by Corporal Allen, and "did seem pretty intoxicated."

58.     Jailer Groessel said that, when a person does cell checks in the booking area, the person walks the whole booking area. He said that the person checks each cell. He said that when he went up to Stefani's cell and noticed that she wasn't visible, he thought that she was using the toilet. However, he said he got a "feeling" and wanted to see her.   A jailer using his or her "feelings" when deciding whether to enter a cell is acting objectively unreasonably and in a deliberately indifferent manner toward the needs of inmates, and in particular with regard to this case, Stefani's known mental health needs.

59.     Jailer Groessel also disclosed that there is a computer at the booking desk that has video surveillance of the cell in which Stefani committed suicide.  He said that he did not use that computer to assist in conducting cell checks, because he acknowledged that he was required to physically get up and walk around and check the cells.  He also noted that the computer on the booking desk, which would allow video surveillance of the cell, was "down and . . . . not working." Upon information and belief, the computer on the booking desk which would have allowed continuous monitoring of Stefani had not been working for some time.

60.     Jailer Groessel also said that the master control room for the whole jail usually "kinda keeps an eye on booking."  He also said that "master control" is able to see into the detox C cell in which Stefani was incarcerated through the video surveillance system.  However, upon information and belief, it was Midland County practice and/or custom that the person working in Master Control need not continuously watch someone such as Stefani, and/or any other inmate sin booking cells.  If a person in Master Control had continuously monitored cells in booking, Stefani would have lived.

61.     Upon information and belief, Jailer Groessel completed a cell check form for the time period including that when Stefani was incarcerated in, and died at, the jail.

LOG CHECK FORM

| START | | MEAL | | HOS | | HOS | |
|---|---|---|---|---|---|---|---|
| JOF | 1445 | IVO | 1703 | IMD | | MED | |
| STM | 1455 | IMS | 1703 | SUI | | SUI | |
| IRC | 1450 | IRC | 1703 | RES | | RES | |
| EQC | 1501 | | | USF | 6746 | USF | |
| | | | | W/O | | W/O | |

| JSC | 1450 | JSC | 2052 |
|---|---|---|---|
| JSC | 1510 | JSC | 2112 |
| JSC | 1520 | JSC | 2127 |
| JSC | 1539 | JSC | 2145 |
| JSC | 1556 | JSC | 2152 |
| JSC | 1614 | JSC | 2203 |
| JSC | 1630 | JSC | 2213 |
| JSC | 1648 | JSC | 2229 |
| | 1703 | AH | 2236 |
| JSC | 1723 | JSC | 2243 |
| JSC | 1756 | JSC | |
| JSC | 1809 | JSC | |
| JSC | 1824 | JSC | |
| JSC | 1840 | JSC | |
| JSC | 1850 | JSC | |
| JSC | 1904 | JSC | |
| JSC | 1920 | JSC | |
| JSC | 1941 | JSC | |
| JSC | 1951 | JSC | |
| JSC | 2005 | JSC | |
| JSC | 2025 | JSC | |
| JSC | 2040 | JSC | |

| STAND IN OFC FOR JSC | | |
|---|---|---|
| OFC | 539 | |
| JSC | 1904 | |

| LAUNDRY WORKER | |
|---|---|
| IN | 1700 |
| OUT | |
| MOP#1 | 1730 |
| MOP#2 | |

539

NOTES

SUPERVISOR
CPl. Allen

OFFICER/CALL
Groessel

DATE
6/17/18

| END | |
|---|---|
| IRC | 2248 |
| STM | 2251 |
| JOF | |

| SUPERVISOR | |
|---|---|
| CLEAR | |

Observation records produced by Midland County also indicate the following, what are referred to as "jail security checks:"

| Log Ev . . . | Event Type | Description | Responsible Officer | Start Date |
|---|---|---|---|---|
| 101726 | JSC | JAIL SECURITY CHECK | RHEA D | 06/17/2018 19:04:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 19:20:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 19:41:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 19:51:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 20:05:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 20:25:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 20:40:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 20:52:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 21:12:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 21:27:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 21:45:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 21:52:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 22:03:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 22:13:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 22:29:00 |
| 101726 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 22:16:00 |
| 101727 | JSC | JAIL SECURITY CHECK | GROSSEL M | 06/17/2018 22:43:00 |
| 101727 | JSC | JAIL SECURITY CHECK | WHITE H | 06/17/2018 22:47:08 |

A handwritten jail log was also produced by Midland County:

# A SHIFT BOOKING ASSINGMENTS

## *SUNDAY* work order 6745

| DATE | 6/17/2018 |
|---|---|
| SUPV | CPL PATTERSON |
| SUPV | |
| | |
| BOOK SUPV | STEWART |
| BOND SUPV | |
| | |
| SECURITY | Lujan |
| ROVER | WHITE, T |
| ROVER | |
| | |
| BOOKING | McCONNELL |
| BOOKING | |
| BOOKING | |
| | |
| BONDING | REEVES |

## *LOGS*

| | | |
|---|---|---|
| JOF---- 0650 | JOF---- 1500 | IMS---- 1133 |
| STM---- 0700 | STM---- 1455 | EQU---- 0705 |
| IRC---- 0652 | IRC---- 1133 | IRC---- 1457 |
| MOP---- 1304 | JSC---- 1030 | JSC---- 1430 |
| JSC---- 0652 | JSC---- 1050 | JSC---- 1451 |
| JSC---- 0710 | JSC---- 1110 | JSC---- |
| 29 JSC---- 0730 | JSC---- 1130 | JSC---- |
| 28 JSC---- 0750 | JSC---- 1150 | JSC---- |
| 30 JSC---- 0810 | JSC---- 1210 | JSC---- |
| 30 JSC---- 0830 | JSC---- 1227 | JSC---- |
| 30 JSC---- 0850 | JSC---- 1250 | JSC---- |
| JSC---- 0910 | JSC---- 1310 | JSC---- |
| JSC---- 0930 | JSC---- 1330 | JSC---- |
| JSC---- 0950 | JSC---- 1350 | JSC---- |
| JSC---- 1010 | JSC---- 1410 | MOP---- |

13

62.     Despite these written and typed records, neither Jailer Groessel, nor Jailer Rhea, nor Corporal Allen conducted appropriate observations of Stefani until she was deceased.  They all failed to assure that continuous monitoring was done, which would be required for a suicidal person.  It takes just a very few minutes – three minutes to seven minutes – for a person to commit suicide.  Stefani as allowed to remain in her cell for a lengthy period of time, well more than even a 15-minute and/or a 30-minute interval cell check, without any face-to-face observation of her.  Further, despite these records, the most that ever happened during any alleged "check" of Stefani while she was in her cell was a cursory look through the cell door windows.  This was completely ineffective, and against clear jail standards.  Stefani was behind the partition, and looking into a cell door window did nothing to comply with constitutional standards and/or to protect Stefani from herself.  Thus, Individual Defendants' objective unreasonableness and deliberate indifference regarding such alleged cell checks caused, were proximate causes of, and were producing causes of all damages in this pleading, including Stefani's death.

63.     Jailer Groessel also typed a narrative regarding what occurred.  He wrote in that narrative that, on June 17, 2018, at approximately 21:27 hours, he stood up from his assigned desk and began a standard jail security check of the jail's booking area.  He wrote that, as he made his way to Detox Cell C, located in the Southwestern corner of the booking area, he noticed that he did not have a visual on Stefani.  This was not a surprise to Jailer Groessel, because he had not been able to obtain a "visual on Stefani" for quite some time.  This was because she had been behind the partition for a lengthy period of time and had committed suicide.  He indicated that Stefani was the only inmate secured in the cell.

### e.     Hunnicutt, K. – Jailer

64.     Officer Hunnicutt typed a statement about what occurred during the night of Stefani's death.  He wrote that, at approximately 21:30, a medical emergency was called in the

booking area via radio.  Officer Hunnicutt wrote that he immediately responded to the area with Officer Mathis, SRU Officer Stotts, and Deputy Esquivel.  Officer Hunnicutt described the situation, including medical treatment provided to Stefani.  He also wrote that he entered Detox Cell C and requested booking keys from Officer Groessel.  He was informed that Deputy Esquivel had the booking keys, and he entered the cell and retrieved them from Deputy Esquivel.  After securing another female inmate into a different cell, he returned the keys to Corporal Allen.  He then exited the booking area to retrieve his firearm, because he would be the officer escorting Stefani to the hospital with EMS.

65.     Officer Hunnicutt wrote that, at 21:36, Stefani was placed into the ambulance.  He wrote that he exited the sally port at 21:40.  He also wrote that he and Stefani arrived at Midland Memorial Hospital  at 21:46.  He described in his statement medical treatment received by Stefani.  He also referenced 22:00 as the time Stefani was pronounced deceased by Doctor Kaufman.  Sheriff Painter arrived at the hospital at 22:15, and Officer Hunnicutt informed him of what he knew about the situation.   Officer Hunnicutt was then escorted back to the jail by Corporal Anderson.

### f.      Rhea, George Darrell – Jailer

66.     Midland County Investigator Chavez and Texas Ranger Gustavo took a statement of George Daryl Rhea at approximately 12:07 a.m. on June 18, 2018.  Jailer Rhea said that he was the receiving Officer when Stefani arrived at the jail.  He further noted that the jail was supposed to have two officers on duty, but there was only one officer on duty that night.

67.     Receiving Officer Rhea said that, when he went to receive Stefani into the jail after he had taken paperwork from apparently Officer Blanscett, Stefani was "sitting there rather droopy, rather, a, slow, whatever."  Receiving Officer Rhea said that he then remembered going into and talking to his supervisor, Corporal Allen, about it.  Therefore, upon information and belief,

Officer Rhea possessed information in the form completed by Officer Blanscett as well as other information gained during a conversation between Officer Blanscett and Corporal Allen.

68.     Receiving Officer Rhea continued his statement.  He said that Corporal Allen came out to Stefani and, after a few minutes, informed Receiving Officer Rhea that Corporal Allen was going to get a nurse down to the area to talk to Stefani.  Jailer Rhea waited inside and, according to him, after a few minutes passed, he saw the nurse and Corporal Allen talking.  He then said that he asked, "Is it alright to go ahead and receive her?"  He said that both of them told him, "Yes."  Therefore, he said that he went out to get Stefani and brought her into the jail.  Jailer Rhea said that Corporal Allen, being the only female officer, took Stefani in and had her strip searched and changed into jail clothing.  Stefani was then brought out into the receiving area.

69.     Receiving Officer Rhea noted that Stefani was intoxicated.  He further said that, based on his "belief in dealing with intoxicated inmates," he thought she should "sleep it off."  Therefore, Jailer Rhea chose not to ask questions on the TCJS – promulgated Screening Form for Suicide and Medical/Mental/Developmental Impairments.  He said, "Well, I'll just ask her these questions when she has sobered up."  He said that Corporal Allen then put Stefani into the detox cell.  Jailer Rhea then apparently did nothing else with regard to Stefani and "went on with further duties."

**Screening Form for Suicide and Medical/Mental/Developmental Impairments**

| County: MIDLAND | Date and Time: 06/17/18  18;25 | Name of Screening Officer:  RHEA  539 |
|---|---|---|
| Inmate's Name: GONZALES, STEPHANIE | Gender: FEMALE | DOB: | If female, pregnant? Yes ☐No ☐Unknown ☐ |

Serious injury/hospitalization in last 90 days? Yes ☐No ☐If yes, describe:

Currently taking any prescription medications? Yes ☐No ☐If yes, what:

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐No ☐If yes, describe:

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐No ☐If yes, describe:

Do you have a history of drug/alcohol abuse?  If yes, note substance and when last used


*Do you think you will have withdrawal symptoms from stopping use of medications or other substances (including alcohol or drugs) while you are in jail?  If yes, describe


*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐No ☐If yes, describe:


*If yes, Notify Medical or Supervisor Immediately

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| *IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | | |
| 1b. Are you thinking of killing or injuring yourself today?  If so, how? | | | |
| 1c. Have you ever attempted suicide?  If so, when and how? | | | |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | | |
| *IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGSITRATE. Notify Mental Health when warranted* | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | | | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | | |
| 6. Are you worried someone might hurt or kill you?  If female, ask if they fear someone close to them. | | | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | | |
| 8. Have you ever received services for emotional or mental health problems? | | | |
| 9. Have you been in a hospital for emotional/mental health in the last year? | | | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | | | |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | | |
| *IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things which are not there)? | | | |
| 15. Is inmate incoherent, disoriented or showing signs of mental illness? | | | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | | |

Additional Comments (Note CCQ Match here):
RECEIVED AT BOOKING,  SUBJECT STATED WAS TOO TIRED AND SLEEPY  QUESTIONS TO BE ASKED WHEN SUBJECT BECOMES SOBER

| Magistrate Notification | Mental Health Notification | Medical Notification |
|---|---|---|
| Date and Time: | Date and Time: | Date and Time: |
| Electronic or Written (Circle) | | |

Supervisor Signature, Date and Time:

70.     Therefore, Jailer Rhea failed to ask numerous critical questions which he was required to ask by the Texas Commission on Jail Standards including:

- Serious injury/hospitalization in last 90 days?

- Currently taking any prescription medications?

- Any disability/chronic illness (diabetes, hypertension, etc.)?

- Does inmate appear to be under the influence of alcohol or drugs?

- Do you have a history of drug/alcohol abuse?  If yes, note substance and when last used.

- Do you think you will have withdrawal symptoms from stopping use of medications or other substances (including alcohol or drugs) while you are in jail?  If yes, describe.

- Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide?

- Are you thinking of killing or injuring yourself today?  If so, how?

- Have you ever attempted suicide?  If so, when and how?

- Are you feeling hopeless or have nothing to look forward to?

- Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things?

- Do you have nightmares, flashbacks, or repeated thoughts or feelings related to PTSD or something terrible from your past?

- Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest?

- Have you ever received services for emotional or mental health problems?

- Have you been in a hospital for emotional/mental health in the last year?

- If you answered yes to the immediately two preceding questions, do you know your diagnosis?

Certain Individual Defendants attempt to paint a picture indicating that Stefani could communicate without any issue whatsoever, and further follow commands.  If true, she could have answered questions.  Moreover, answers to certain questions above, when answered in the affirmative, would

require notification to a magistrate and mental health professionals when warranted.  There were other observation questions on the form, which Jailer Rhea chose not to ask:

- Does inmate show signs of depression (sadness, irritability, emotional flatness)?

-  Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things which are not there)?

- Is inmate incoherent, disoriented or showing signs of mental illness?

If answers to any such questions were "Yes," then Jailer Rhea was required to notify his supervisor, a magistrate, and mental health professionals immediately.  Jailer Rhea just simply ignored his duties to do so and thus acted objectively unreasonably and in a deliberately indifferent manner regarding Stefani's known mental health and self-harm issues.

71.     Upon information and belief, Officer Rhea was in fact doing in practice what was the custom and/or practice of the Midland County jail.  Jailer Rhea had been an employee of the Midland County Sheriff's office for nearly thirty years.  He therefore had sufficient knowledge about the manner in which the jail was operated.  If custom and/or practice was different from what Officer Rhea was doing at the time, he of all people would have known as much.

72.     Much later, Jailer Rhea heard Officer Groessel shouting and running toward cell C. Jailer Rhea observed Officer Groessel yelling about getting a pair of scissors. It was shortly thereafter that Jailer Rhea learned that Stefani had committed suicide.  Based on Jailer Rhea's experience, this should have been no surprise to him.

73.     Jailer Rhea said that Lieutenant Hillyard appeared at some point and asked Jailer Rhea why he did not do the medical intake for Stefani.  Jailer Rhea said that he thought "that she was just too sleepy, intoxicated."  He further said that he printed an intake form and there were no questions answered for Stefani.  He said, however, that he indicated that the bottom of the form

that he did not ask the questions because he thought that she was too intoxicated and that he would ask questions when she "sobered up."

74.     Investigator Chavez confirmed with Jailer Rhea that he knew that Stefani was brought in for public intoxication.  Jailer Rhea further described what he observed in Stefani that caused him to believe that she was in fact intoxicated.  Jailer Rhea stated, upon information and belief, a custom of the jail which was contrary to written policy, based upon his "nearly twenty eight years of working" there.  He said that he had worked with "so many intoxicated people."  Upon information and belief, Jailer Rhea was expressing the custom and practice of Midland County in not completing intake forms, as required by written policies and State regulations for people who were intoxicated.

75.     Jailer Rhea said that he learned "an extremely hard lesson."  He also said, "[N]ext time, I don't care if their drunk or not, I'm going to attempt to ask."  Jailer Rhea did not need to learn the "lesson," because written policies had been in place for quite some time, and State regulations clearly required that he ask the questions and take certain actions if the questions were not answered at all.  He further said that he had "no excuse" for what happened.

76.     Jailer Rhea also, upon information and belief, typed a statement into the Midland County Sheriff's Office system.  He wrote that, at approximately 21:20 or so, he was finishing up paperwork when he heard Jailer Groessel hollering and running in the direction of Detox Cell C. When Jailer Rhea arrived, Jailer Groessel was already inside the cell and had yelled for medical attention.

77.     Moreover, Jailer Rhea typed a booking information report into the Midland County Sheriff's Office system.  Jailer Rhea wrote that, at approximately 5:15 p.m., Jailer Rhea received Stefani from the Midland Police Department on a charge of public intoxication.  Jailer Rhea wrote

that he noticed Stefani's slow reaction, and thus informed Corporal Allen.   Corporal Allen instructed Jailer Rhea to leave Stefani in the bench area until a nurse had an opportunity to speak with her.   After several minutes, Jailer Rhea asked Corporal Allen and the nurse if Stefani was "good to accept."   "Both replied in the affirmative."

78.     This decision was objectively unreasonable and deliberately indifferent to Stefani's known mental health issues.   As shown above, Corporal Allen could not rely on the cursory alleged "examination" of the nurse when agreeing to accept Stefani into the jail.   Moreover, upon information and belief, if the nurse did not possess all other information about Stefani mentioned in this pleading that Individual Defendants possessed, then this custom and/or practice of Midland County also resulted in and caused, and was a moving force behind, Stefani's damages and death. In the alternative, if the nurse possessed all other information about Stefani possessed by Individual Defendants, then the nurse acted objectively unreasonably and in a deliberately indifferent manner.

79.     Jailer Rhea wrote that Corporal Allen then strip-searched and changed out Stefani. Jailer Rhea completed a property reception form.   However, before Jailer Rhea started what he referred to as "CCQ questioning" and medical intake, Stefani stated that she was tired and sleepy. Corporal Allen asked if Jailer Rhea was finished with Stefani, and Jailer Rhea wrote that he had the belief that Stefani was too intoxicated to answer questions.   Therefore, Jailer Rhea wrote that he informed Corporal Allen that he was finished with Stefani.   Jailer Rhea wrote that he "did a medical intake without answers, but did write that the intention was to ask her CCQ once when she had sobered up."   "CCQ" refers to a Continuity of Care Query and is simply a query into a database as to whether an arrestee has received mental healthcare.   CCQ is not, as Jailer Rhea asserted, a list of mental health questions.   Nevertheless, unfortunately, the last thing he wrote,

was "Incidents and events proved Rhea did not get the chance to do so." This was no surprise to anyone, as it was apparent to Individual Defendants that Stefani would commit suicide.

### g.      Santoyo, A. – Clerk

80.      Clerk Santoyo also wrote a statement regarding the incident. Clerk Santoyo indicated that he/she was working on wrap sheets for the day while Jailer Groessel was doing rounds and checking on inmates. Clerk Santoyo said that he/she heard Jailer Groessel knock on a door. When Clerk Santoyo looked up, he/she saw Jailer Groessel entering Detox Cell C to check on Stefani. Clerk Santoyo wrote that Corporal Allen thereafter called via radio for medical assistance. Therefore, Corporal Allen was in close proximity to the cell in which Stefani had committed suicide.

### h.      Stotts, J. – SRU Officer

81.      Officer Stotts wrote that he/she was stationed as E/F block of the Midland County Central Detention Center. Officer Stotts wrote that, at around 21:28 hours, Corporal Allen in booking transmitted via radio a medical emergency in booking, and that personnel were needed as soon as possible. After Officer Stotts made his/her way to booking, and observed what was occurring, Officer Groessel told Officer Stotts that Stefani had tried to commit suicide by hanging.

### i.      White, N. – Officer

82.      Office White wrote a brief statement about what occurred. Officer White wrote that, while he/she returned from a break, and went into Master Control, Corporal Anderson advised that there was an emergency in booking. Corporal Anderson was on the phone with dispatch advising the dispatcher of the incident. Officer White then took over Master Control and resumed his/her duties. Upon information and belief, Officer White, as well as other Midland County employees who worked in Master Control, did not observe inmates such as Stefani in booking

cells through the computer system.  Upon information and belief, such failure to make such observations was consistent with Midland County custom and/or practice.

### 4.    Video Evidence

83.    A Midland County Sheriff's Office video, with file name "Detox C 1.mp4," contains a video recording of Stefani's cell.  It begins at a point in time after which Stefani was placed into the cell and concludes after Stefani's suicide.  As pointed out elsewhere in this pleading, Midland County Sheriff's Office failed to assure that its various recording devices were synced with the same time.  Therefore, actual times of relevant events in this pleading are somewhat uncertain.  Regardless, the gap in time between relevant events is what is material to Plaintiff's claims.

84.    The video begins with a time shown, for Sunday, June 17, 2018, of 20:21:43. Stefani can be seen on the cell door-facing side of a partition wall which separates a toilet area from the main portion of the cell.  She is initially eating what appears to be a sandwich.  She then stands and moves to the toilet area fairly quickly, after pushing a bag against a slot in the partition wall appearing to attempt to hide what she intends to do.

85.    Stefani can be seen removing her jail-issued pants behind the partition at approximately 20:22:45.  Moreover, Stefani appears to be unstable on her feet.  When she stumbles, it is clearly evident from the perspective of the camera that Stefani has removed her pants.  This can clearly be seen on the video recording.

86.    Stefani can be seen tying off the pants behind the partition at approximately 20:23:22.  There is no doubt, viewing the video, as to what she is doing.  She glances toward the front of the cell a few times, obviously trying to see if anyone is watching her.  No one is.  Stefani immediately goes down behind the partition wall so that she is generally not seen.  All reasonable jailers, and all Midland County Individual Defendants, would know exactly what Stefani is doing

at that time.  Unfortunately, on that Sunday, Individual Defendants at the Midland County jail did nothing while Stefani committed suicide.

87.     At approximately 20:24:58, the top of Stefani's head can be seen over the partition wall.  It is generally clear from the movement of her head, and her right arm which becomes visible, that she is working to do something behind the partition.  All reasonable jailers would have entered the cell as soon as Stefani began tying off her pants.  Unfortunately, neither Individual Defendants, nor anyone in Master Control, did anything.

88.     At approximately 20:26:12, Stefani's head can once again be seen over the partition wall.  It is clear that Stefani is not using the toilet at any time when she is seen in this recording. At approximately 20:33:03, some movement can be seen over the partition wall.   Individual Defendants continued doing nothing related to Stefani.  At approximately 20:37:33, Stefani's head and some movement can be seen over the partition wall.  It appears that Stefani is continuing to work to form the noose with which she will commit suicide.  Individual Defendants at the Midland County jail do nothing.

89.     It is apparent from the video that Stefani is putting the noose over her head. Movement of Stefani's head can be seen over the partition, for the last time, at approximately 20:40:35.  This is approximately 19 minutes after the video begins and an uncertain amount of time after Stefani was initially put into the cell.  Upon information and belief, she dies within three to give minutes thereafter.  Still, no one enters Stefani's cell.  It is clear and apparent that no one is making any face-to-face observations of Stefani.  Even if a person chose to attempt to see Stefani on the video, she was completely hidden behind the partition wall.  Individual Defendants working at the Midland County jail shirked their responsibility, acted objectively unreasonably, and were deliberately indifferent to Stefani's mental health needs and ultimately her suicide.

90.     The video recording concludes at approximately 21:07:56, with Stefani deceased in her cell, and with no one having entered her cell or made any face-to-face observations of her. The entire video was approximately 46 minutes long.

91.     A Midland County Sheriff's Office video, with file name "Detox C 2.mp4," contains a video recording of Stefani's cell.  The video begins with a time shown, for Sunday, June 17, 2018, of 21:07:57.  This video recording is approximately 24 minutes long.  It thus picks up where the above-referenced video ends.

92.     Individual Defendants at the Midland County jail continuing doing duties other than those which they owed to Stefani.  Stefani's lifeless body lies in her cell, while Individual Defendants do nothing to observe her and/or check on her.  Finally, but unfortunately far too late for Stefani, the door to Stefani's cell opens at approximately 21:19:42.  This was approximately 11 minutes, 44 seconds after the beginning of this second video recording, and nearly an hour after the beginning of the above-referenced first video recording.  Jailer Groessel shortly thereafter walks slowly into the cell and toward the back.  At approximately 21:19:51, based on Jailer Groessel's body language, he realizes what has occurred.  No medical assistance will revive Stefani at this point, because she has been deceased for quite some time.

### 5.     Medical Treatment and Death Reports

#### a.     Medical Records

93.     Information in this portion of the complaint was obtained from medical records. Midland Fire Department EMS records indicate that EMS personnel were dispatched to Stefani's suicide attempt.  The narrative reads that, upon arrival, EMS personnel found a 36-year-old female "laying on the bathroom floor unresponsive."  The narrative also reads that the facility nurse stated that jail staff had performed 10 rounds of CPR before EMS's arrival.  EMS personnel immediately checked for a radial and carotid pulse, and both were absent. CPR was continued.  Stefani was

then transported to the hospital. Medication was administered, and CPR was continued with no change in Stefani's condition. Stefani was taken to an assigned emergency department room in the hospital and transferred to a hospital bed.  Despite efforts by EMS personnel, there was nothing that could be done to revive Stefani.

94.     Hospital records indicate that Stefani presented to the emergency department with CPR in progress via EMS from the jail.  The hospital – Midland Memorial Hospital Main – was the same hospital to which Stefani was transported the day before (June 16, 2018) with chest pain. When Stefani arrived on June 17, 2018 from the jail, hospital records indicate that she was unresponsive.  As is unfortunately true with many medical records, hospital medical records incorrectly read that Stefani "was found in cell hanging from ceiling."  EMS personnel were unable to report to healthcare providers at the hospital the time of Stefani's suicide attempt.  Stefani was pronounced as being deceased.

b.      Autopsy – Tarrant County Medical Examiner

95.     An autopsy was conducted by Susan Roe, M.D., Deputy Medical Examiner with the Office of Chief Medical Examiner, Tarrant County Medical Examiner's District.  A comment in the report read: "This case was presented in Morning Conference on 7/13/2018.  There is consensus with cause and manner of death."  The report provides as cause of death, I – Hanging; and II – Bipolar Disorder.  Thus, it was clearly Stefani's mental health issues, of which Individual Defendants were aware, that led to her suicide.

c.      Custodial Death – Midland County Sheriff's Office (Filed with Attorney General)

96.     The Midland County Sheriff's Department filed a custodial death report with Ken Paxton, Attorney General of Texas.  The report was completed by Captain Rebecca Graham on July 3, 2018.  The report indicates that the time of custody or incident was 7:40 p.m. on June 17,

2018, and that Stefani died at 10:00 p.m. on June 17, 2018.  The report reads that Stefani passed

away as a result of suicide by hanging/strangulation in a detox cell.  The report also indicates that

the only reason that Stefani was arrested was due to public intoxication.  The report reads that

Stefani was received into the jail at 8:13 p.m.  The report alleges that the booking officer

determined that Stefani was too intoxicated to answer suicide screening questions.  This allegation

is in stark contrast to Corporal Allen's allegation referenced elsewhere in this pleading.  The

booking officer did not complete the state-required form.  The report included a "Summary of

Incident" section:

**29. ATTACH A SUMMARY OF HOW THE DEATH OCCURRED:**

Inmate was received at facility at 2013 hours and cleared medically.
Inmate was received by booking officer and determined too intoxicated to answer suicide screening
questions and did not fill out suicide screening form. Officer did not place on suicide watch, did not
notify supervisor, and did not notify medical. Inmate was placed in Detox cell at 2023 hours.

Booking Security officer conducted security checks and last made face to face contact at 2040
hours.

Booking Security officer continued checks but thought inmate was on toilet that is located behind
privacy wall, located in detox c.

Booking Officer Security checks by time:

2023 inmate entry into cell
2025 inmate eating on  bench
2040 officer states he saw her
2052 officer stated he though she was on toilet - by camera he is seen looking into cell
2057 officer on camera back at cell
2059 officer on camera back at cell
2127 officer enters cells

Once inside the detox cell Booking Security officer found inmate hanging with her jail issued uniform
pants around her neck and tied to the handicap bar for the toilet.

Assistance was called and inmate was removed from the bar and the pants removed. CPR began
and 911 called. EMS arrived and inmate was transported to the hospital. At the ER, livesaving aid
was continued but was  unsuccessful and inmate was pronounced deceased at 2200 hours
06/17/2018.

97.     Plaintiff does not concede that listed times are correct, whether in the above-referenced report or in any other document cited or reproduced herein.  Plaintiff reproduced some such documents to provide context for Plaintiff's claims and to more clearly illustrate what occurred.  Moreover, as demonstrated elsewhere herein, the Midland County jail did not even sync times on its various cameras.  Thus, exact times cited by Midland County and/or in documents produced by it to Plaintiff before suit was filed are suspect at best.  Nevertheless, it is not the exact times of certain occurrences which are important, as they relate to claims in this case, but rather the passage of time between material events.

98.     The Midland County Sheriff's Department captain flatly wrote, "Officer did not place on suicide watch, did not notify supervisor, and did not notify medical."  This was a tacit admission that the referenced officer was deliberately indifferent to Stefani's known mental health needs, and that Stefani should have been put on constant suicide watch.  It is curious at best that the captain alleged that "medical" had not been notified, when other documents indicate a cursory conversation with a nurse (described elsewhere in this pleading).

99.     The form also indicates that Stefani was placed into the detox cell at 8:23 p.m.  The autopsy report was consistent in listing that Stefani died as a result of suicide by hanging, but also listed bipolar disorder.  It is common knowledge among those working in Texas jails, through their training and/or education, that a person diagnosed with bipolar disorder, and who is intoxicated and has other mental health issues, is at a high risk of suicide when placed into a jail setting, especially in the first few hours or days.  Upon information and belief, Individual Defendants possessed this knowledge when dealing with Stefani.

<u>d.      Inquest Report – Judge Cobos</u>

100.    An inquest was performed by Judge D. Cobos, and Judge Cobos drafted a report as a result.  The report lists Texas Ranger Gustavo Sanchez as the investigating officer.  The report

reads that jail personnel indicated that Stefani was "high/intoxicated," claiming that she had taken approximately 10 Xanax. The report also reads that jail personnel indicated that Stefani was uncooperative and refused to answer any questions at booking. This "uncooperative" allegation is in stark contrast with statements given by one or more Midland County Individual Defendants.

101. The report also reads that, the evening before Stefani's suicide, on June 16, 2018, Stefani was brought to a hospital ER acting irrationally and screaming at medical staff. This was only partially true, in that Stefani initially received medical treatment without issue but later acted out and left the hospital due to her serious mental health issues. The report also says that she abruptly left the ER wearing a blood pressure cuff with an IV in her arm. The report indicates that police were called at the time but were ultimately unable to locate Stefani. Public Information Act requests to both the Midland Police Department and Midland County Sheriff's Office resulted in substantively "no records" responses for records regarding any such June 16, 2018 phone call. The hospital tox screen indicated that Stefani was positive for amphetamines. Therefore, Stefani had clearly received treatment at a local hospital, contrary to Officer Blanscett's representation on the jail intake form, and which would have been explicitly disclosed had the jailer done a proper intake and completed the Texas Commission on Jail Standards form. The fact that no one apparently contacted the hospital listed on the hospital bracelet being worn by Stefani at the time of her arrest, and/or further inquired as to the medical treatment she had received, was further evidence of Individual Defendants' objective unreasonableness and deliberate indifference when dealing with Stefani.

E.      Investigations

1.      Midland County

102. Midland County Sheriff's Office conducted an investigation regarding Stefani's death, and it generated a report as a result. The report indicates that Investigator M. Chavez was

contacted by Sergeant O'Donnell, at approximately 9:36 p.m. on June 17, 2018, regarding a female who had attempted suicide at the Midland County Detention Center. Sergeant O'Donnell advised Investigator Chavez that Sergeant O'Donnell was in route and would advise as to the outcome. Approximately six minutes later, Investigator Chavez heard from Lieutenant Weatherby and was told that there was a completed suicide at the detention center, and that Investigator Chavez needed to respond. Investigator Chavez learned through another phone call that Sheriff Painter and a Midland County jailer were currently at Midland Memorial Hospital with the deceased female (Stefani). Investigator Chavez then proceeded to Midland Memorial Hospital.

103. When Investigator Chavez arrived at the hospital, she learned some information from Jailer Hunnicutt. Jailer Hunnicutt indicated that she (Jailer Hunnicutt) was not in booking at the time of the incident but was nonetheless told to go the hospital with Stefani. Investigator Chavez left the hospital at approximately 11:06 p.m. and proceeded to the jail. She and Sergeant Allee arrived at the jail at approximately 11:15 p.m.

104. Investigator Chavez and Ranger Gustavo Sanchez examined the cell where Stefani committed suicide. Photographs of the cell were taken. Investigator Chavez noted that Stefani's orange jail pants were hanging from a rail connected to the toilet. Investigator Chavez reviewed video from the camera in Stefani's cell, clearly showing Stefani removing her pants and starting the process of committing suicide. She also noted that no one entered the cell from 8:30 p.m. through 9:27 p.m. Stefani was in the cell alone, and no face-to-face visual checks were conducted. This is in clear violation of even the minimum standards promulgated by the Texas Commission on Jail Standards, and it is more than sufficient evidence of deliberate indifference and objective unreasonableness of the Midland County Individual Defendants.

105. Investigator Chavez's report listed the following people as witnesses:

- Jailer George Darrell Rhea;
- Jailer Matthew Groessel;
- Corporal Monica Allen;
- ***blank space here in report***
- Corporal Anderson;
- Deputy Esquivel;
- Jailer Hunnicutt;
- Jailer McLaughlin;
- Jailer Mathis; and
- Jailer Stotts.

Upon information and belief, the blank space in Investigator Chavez's report between the listed Individual Defendants and the other six listed people was to signal that the listed Individual Defendants were those with direct contact with, and the ability to save, Stefani.

106.    Investigator Chavez reviewed jail camera video.  She was able to see where Stefani removed her pants and began the process of attempting suicide.  Investigator Chavez wrote, "At no point did anyone enter detox C from the time frame of 2030 hours to 2137 hours."  She also noted that Stefani was alone in detox C.  This is inexcusable.  The Texas Commission on Jail Standards' minimum requirements require county jailers to make face-to-face observations of all inmates no less than once every 60 minutes.  This requirement is for normal inmates.  However, for inmates who are known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior, such observations, at a bare minimum, must be performed at least every 30 minutes.  Despite such minimum standards, even the 30-minute observation makes little sense when considering a potentially suicidal person.  Such a person can easily commit suicide in much less than 10 minutes.  Thus, from a sensible and practical perspective, such persons must be continuously observed.  Regardless, Individual Defendants working at the Midland County jail did not even fulfill anything close to the 30-minute checks.  As a result, Individual Defendants who worked at the Midland County jail acted objectively unreasonably, and in a deliberately indifferent

manner, and thereby caused and proximately caused all damages referenced in this pleading, including Stefani's death.

107.    Investigator Chavez also noted, when she began to review video surveillance recordings provided to her by Lieutenant Hilliard, that it was clear that there was would be an approximate 18-minute time discrepancy between the actual camera within detox C, the camera labeled "checks leaving," and the camera labeled "Sally Port."  It is beyond belief that a jail serving a large county in Texas would not synchronize the time on cameras which are used to assure that inmates are being appropriately monitored and served and employees are appropriately doing their jobs.  Unfortunately, considering the continued problems with the Midland County Sheriff's Office, some of which are referenced in this pleading, and all occurrences leading to and which were a moving cause behind Stefani's damages and death, it might have been par for the course. Investigator Chavez also wrote, based upon her review of the video recordings:

> From video surveillance labeled "5 c28 dvr2 book east" it is observed Gonzales being placed into Detox C by Allen at approximately 2029 hours.  From the same camera it is observed Groessel walking by Detox C periodically.  From the same camera Gonzales is observed walking around at from the time frame of 2039 to 2041 hours. From the said camera Gonzales was no longer visible from that point. At approximately 2137 hours it was observed on the said camera Groessel walking inside Detox C and discovering Gonzales.

> From video surveillance labeled "Detox C1" and "Detox C2" Gonzales is observed standing up near the privacy wall, taking her last bite of food, and then removing her pants at approximately 2022 hours.  Gonzales is observed looking out as she began the process of attempting suicide standing up.  Gonzales then knelt down and from the time from of 2023 hours to the time she was discovered from the Detox C camera at approximately 2119 hours by Groessel (96 minutes).  However, Gonzales was vaguely seen from the Detox C camera periodically.  The last visible sign of Gonzales from the said camera was going to be from 2040 hours up until she was discovered by Groessel at approximately 2119 hours (79 minutes).

108.    This description alone presents a damning indictment of Individual Defendants who worked at the Midland County jail.  It also, when looking at the two separate paragraphs,

demonstrates the problem when the Midland County Sheriff's Office chose not to sync the times on its various cameras within its jail.

109.    When reading the second paragraph above, regarding the surveillance video labeled "Detox C1" and "Detox C2," the reader wants to reach out and help Stefani when no one else chose to do so.  It is worthy of note that this incident occurred on a Sunday.  It appears that staff treated their duties as if they were off for the weekend.  While this seems to be a harsh statement, the evidence supports it.

110.    Investigator Chavez notes that Stefani began to attempt suicide and knelt down at approximately 8:23 p.m. (according to the time stamp on that camera).  She was not discovered by Jailer Groessel until approximately 96 minutes later – which is over three times the thirty-minute observation minimum requirement by the Texas Commission on Jail Standards and well beyond any reasonable jailer's, or any reasonable juror's, imagination as to how long a person with Stefani's known serious mental health issues should be left without observation.  This is clear evidence of deliberate indifference and objective unreasonableness not only by Jailer Groessel, but also the other Individual Defendants working at the jail.  Sadly, the referenced paragraph above indicates that the last visible sign of Stefani from the camera was allegedly at approximately 8:40 p.m. –  long before Jailer Groessel finally chose to do what he should have done all along – had a face-to-face observation of Stefani.  Unfortunately, it was far too late.  Stefani had been deceased for quite some time, and the best medical professionals in or near Midland County could do nothing to bring her back.

111.    Captain Rebecca Graham, with the Midland County Sheriff's Office, completed and filed or caused to be filed with the TCJS a Standard Inmate Death Reporting form.

### Inmate Death Reporting Form

Please complete the form and send it back . Other documents that you need to provide are included below.
Email to:   death@tcjs.state.tx.us   or, fax to (512) 463-3185.

- •**Booking Sheet**
- •**Mental Disability/Suicide Screening Form**
- •**Timeline of medical services, nurses notes, Physician/Psychiatric orders, Medication Administration Records (MAR) and mental health evaluations (if available)**
- •**Round Sheet - Face-to-Face Observation Log (12 Hours Prior to incident)**
- •**CCQ (Continuity of Care Query printout)**
- •**Notification of Magistrate, Mental Health official, Medical Personnel and Supervisor (if required by screening form)**
- •**Please provide a copy of the video recording of the area where death occurred (if available)**
- •**Upon conclusion of the autopsy, the sheriff/operator shall forward a copy of the report to the Texas Commission on Jail Standards within 10 days.**
- •**Upon conclusion of the investigation by the sheriff/operator or any other designated law enforcement agency, the sheriff/operator shall forward a copy of the report to the Texas Commission on Jail Standards within 10 days.**

Date/ Time of Report _____ 6/19/2018 _____ County/Facility _____ Midland _____

Reporting Officer _____ Rebecca Graham _____ Title _____ Captain _____

Facility where death occurred _____ Midland County Detention Center _____

### Deceased Inmate Information

Name of Deceased _____ Stephanie Ann Gonzales _____ SID# _____

Gender   Male ☐   Female ☑   Date of Birth _____████_____ Age __36__ Race _____ White _____

Was inmate being held for another agency? If yes, list agency _____

Date/Time of Book-in: _____ 06/17/2018/2013 hours _____ Date/Time of Death: _____ 06/17/2018/2200 hours _____

Where did the death occur(Holding, Cell #, infirmary, etc.)? _____ holding cell _____

When was the last face-to-face contact with the inmate? _____ 2040 hours _____

Name of officer that had the last known contact with inmate: _____ Groessel M _____

Name of person who found the deceased: _____ Groessel M _____ Title _____ Jailer _____

If known, manner of death(Accident, Natural, Homicide, Suicide,) _____ Suicide _____

**At the time of death, was the inmate?**
Under influence of alcohol/drugs        Yes ☐   No ☐   Unknown ☑
On Suicide Watch        Yes ☐   No ☑   If yes, last documented date/time check _____
*At the time of death, was an autopsy ordered?*   Yes ☑   No ☐   What was the result of the autopsy? _____

*Is there video evidence available for the area where death occurred?*   Yes ☑   No ☐   If so, please submit a copy of the recordings either on a compact disc (CD) or on a flash drive. Please include the video and any drivers necessary that will allow Commission staff to properly review the requested video.

List any/all known medical conditions: _____ PTSD, biopolar disorder, and depression (gave information to arresting officer) _____

Name of Investigating Officer/Agency: _____ Gustavo Sanchez/ Texas Ranger _____ Title: _____ Investigator _____

**On separate sheet, briefly explain the circumstances of the death**

Revised 3/2017

**Use this sheet to briefly explain the sequence of events leading to the death:**

Inmate was received at facility at 2013 hours and cleared medically.

Inmate was received by booking officer and determined was too intoxicated to answer suicide screening questions and did not fill out suicide screen form. Booking Officer did not place on suicide watch, did not notify supervisor, and did not notify medical. Inmate was placed in Detox cell 2023 hours.

Booking Security Officer conducted security checks and last made face to face contact at 2040 hours.

Booking Security Officer continued checks but thought inmate was on toilet that is located behind privacy wall, located in detox c.

Booking Officer Security checks by time:

2023 entry into cell

2025 eating on bench

2040 officer states he saw her

2052 officer stated he thought she was on toilet – by camera view he is seen looking into cell

2057 officer on camera back at cell

2059 officer on camera back at cell

2127 officer entered cell


**Please note all cameras are on digital DVR servers and times are varied and do not match "real time"** some camera times are as much as 7 to 10 minutes faster than real time.


Once inside the detox cell Booking Security Officer found inmate hanging with her jail issued uniform pants around her neck and tied to the handicap bar for the toilet.

Assistance was called and inmate was removed from the bar and the pants removed. CPR began and 911 called. EMS arrived and inmate was transported to the hospital. At the ER, lifesaving aid was continued but was unsuccessful and inmate was pronounced deceased at 2200 hours.

      112.    As indicated elsewhere in this complaint, Plaintiff does not concede that listed times in the above-referenced report are correct, or times listed in any other referenced report in this pleading.  The time between important events is more important that the specific time at which each event occurred, as it relates to Plaintiff's claims.

### 2.      Texas Rangers

113.    The Texas Rangers investigated Stefani's death.  The lead investigator was Gustavo Sanchez.  The typical purpose of a Texas Rangers investigation regarding a custodial death, such as Stefani's, is to determine whether there was any criminal responsibility for what occurred. Texas Rangers do not determine whether there is civil liability, such as that alleged in this case. Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury for prosecution does not determine whether Defendants are liable for Stefani's death and other damages referenced in this pleading.

### 3.      Texas Commission on Jail Standards

114.    The Texas Commission on Jail Standards ("TCJS") conducted an investigation of Stefani's death.  The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the State agency charged with enforcing bare minimum jail standards.  The TCJS determined that the Midland County jail failed to meet minimum jail standards, and it issued a notice of non-compliance to Midland County.  The TCJS did not make a rash decision.  TCJS Inspector Wendy Wisneski determined that a notice of non-compliance should be issued.  Assistant Director Shannon Herklotz then reviewed the determination and approved it.  TCJS Executive Director Brandon Wood then concurred and also approved issuance of a notice of non-compliance.

*Suicide 2018*

# Death in Custody Review Checklist

Reviewed_____

Entered_____

Video ✓_____

**County/Facility:** Midland

**Inmates Name:** Stephanie Anna Gonzales     S.O. / SID Number: 403735

**Date of Death:** 06/17/18

**Booking Sheet:** ✓     **Autopsy Report:** pending     **CCQ Entry:** ✓

**Suicide Screening:** No     **Final Report:** pending     ↓ **Magistrate Notification:** ↓

**Observation Logs:** ✓     **Other Reports:** med/reports     No

**Inspector Review:**          See attached report.

**Signature:** _Wilde St_          **Date:** 07/10/18

**Recommendation(s):**

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

**Assistant Director Review:**          See attached report.

**Signature:** _Shannon J Hilton_          **Date:** 7/10/2018

**Recommendation(s):**

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

**Executive Director Review:**     Concur w/NONC

**Signature:** _Brandon Wood_          **Date:** 7/11/18

**Recommendation(s):**

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☑ A notice of non-compliance was issued for failing to meet Minimum Jail Standards.

**Notice of Non-Compliance Issued:**     (Yes)  or  No          Created 9/20/2017

115.     Relevant portions of a summary TCJS investigation report, read:

Investigation reveals I/M Gonzales, Stephanie was processed into the Midland County Jail on June 17, 2018 at approximately 2013 hours for Public Intoxication. The arresting officer documented that I/M Gonzales indicated she suffered from PTSD, Bipolar Disorder and Depression and wanted an "isolated cell". The facility nurse spoke with I/M Gonzales who indicated that she had taken ten (10) Xanax; the nurse received clarification I/M Gonzales did not take them all at once but rather over the course of the day and the nurse further documented I/M Gonzales was alert and answered questions directly. The screening form was not completed but the CCQ came back as a possible match. I/M Gonzales was not placed on suicide watch and neither the mental health staff nor the supervisory staff were notified. According to paperwork received, I/M Gonzales was placed in Detox at 2023 hours.

At approximately 2127 hours, an officer was conducting rounds and was unable to observe I/M Gonzales in the cell. She had been behind the partition screening the toilet from outside view for the previous checks, so the officer entered the cell. I/M Gonzales was observed to be sitting on the floor of the cell next to the toilet with one leg of her jail issued uniform pants tied around her neck and the other leg tied around the handicap rail next to the toilet. The uniform was knotted in several places and the officer was unable to untie them. The officer called for assistance and scissors. Responding officers arrived and were to remove the uniform pants from the neck of I/M Gonzales. CPR was initiated and medical arrived. EMS was contacted and arrived to transport I/M Gonzales to Midland Memorial Hospital where she was pronounced deceased. Final autopsy and investigative reports are pending.

Video reviewed indicates the time was off by approximately 10 minutes: I/M Gonzales was placed in the cell at approximately 2030 hours; a check is conducted at approximately 2034 hours. At approximately 2039 hours, I/M Gonzales can be seen in the window of the cell. At approximately 2048 hours, a check is conducted; the officer can be seen looking in the window several times and the officer is seen going back to look again at 2101 hours. At approximately 2104 hours, the officer is seen looking in the window again. At approximately 2137 hours, the officer is seen back at the cell and looking into the window at different angles before opening the door and entering the cell and the officer can be seen walking through the cell. The video shows the officer at the door to the cell, and other officers responding to something. A second officer enters the cell and immediately returns to the door and several other officers respond quickly. At approximately 2138, medical is in the cell and EMS is on the scene at 2144 hours. At 2147, EMS is off scene with I/M Gonzales and out of camera view.

Inspector Wendy Wisneski reviewed all submitted paperwork and video to ensure compliance with minimum jail standards. After careful review, it was determined

that two (2) violations of minimum jail standards occurred and a notice of non-compliance was issued on July 10, 2018.

TCJS Assistant Director Shannon Herklotz signed the summary portion of the report and dated it

July 10, 2019.  TCJS issued a Special Inspection Report:



## Texas Commission on Jail Standards

Midland County Jail

Midland, Texas   Administrative Noncompliance          July 10, 2018

                                                   Date(s) of Inspection

SUBJECT:     SPECIAL INSPECTION REPORT

State Law requires periodic inspections of county jail facilities (VTCA, Local Government Code, Chapter 351, VTCA, Government Code, Chapter 511; Chapter 297.8, Texas Commission on Jail Standards).

☑ The facility was inspected on the date(s) indicated above, and it was determined that deficiencies exist.  You are urged:  (1) to give these areas of noncompliance your serious and immediate consideration; and (2) to promptly initiate and complete appropriate corrective measures.  The Commission is available to discuss or assist you with the appropriate corrective measures required.

   Failure to initiate and complete corrective measures following receipt of the Notice of Noncompliance may result in the issuance of a Remedial Order (Chapter 297.8, et seq.).

☐ This facility was inspected on the date(s) indicated above. There were no deficiencies noted and upon review of this report by the Executive Director of the Texas Commission on Jail Standards, a certificate of Compliance may be issued per the requirements of VTCA, Chapter 511 and Texas Minimum Jail Standards.

Authenticated:                                        Inter-Office Use Only

*Wendy Wisneski, TCJS Inspector*

Received by: _Jammie Linden 7.10.18_   Date

RECEIVED

JUL 10 2018

Texas Commission on Jail Standards

Reviewed by: _Shannon J Herklotz_   7/10/2018   Date

cc:     Judge
        Sheriff

Individuals and/or entities regulated by the Texas Commission on Jail Standards shall direct all complaints regarding the commission procedures and functions to the Executive Director at: P.O. Box 12985 Austin, Texas 78711 (512) 463-5505 Fax (512) 463-3185  or at our agency website at www.tcjs.state.tx.us .

The second page of the Special Inspection Report cited portions of minimum jail standards which the Midland County jail had violated.

**TEXAS COMMISSION ON JAIL STANDARDS**
**SPECIAL INSPECTION REPORT**

**Facility Name:** Midland County Jail        **Date:**     July 10, 2018

| Item | Section | Paragraph | Comments |
|---|---|---|---|
| 1 | 273 | .5 (b) | Screening Instrument. An approved mental disabilities/suicide prevention screening instrument shall be completed immediately on all inmates admitted. |
| | | | **After reviewing documentation received from county officials as well as self reporting by the facility administration, it was determined that the screening form was not completed on Inmate Gonzales due to her intoxicated state.  Inmate Gonzales was not placed on suicide precautions and neither the medical staff nor the supervisory staff were notified as required.** |
| 2 | 275 | .1 | Every facility shall have the appropriate number of jailers at the facility 24 hours each day. Facilities shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined. |
| | | | **After reviewing documentation and video evidence received from county officials as well as self reporting by the facility administration, it was determined that the face-to-face observations of Inmate Gonzales were not conducted every 30 minutes as required.** |

**Wendy Wisneski -TCJS Inspector**

Administrative Noncompliance

RECEIVED

JUL 1 0 2018

Texas Commission on Jail Standards

F.    Midland County Sheriff's Office Written Policies

116.    The Midland County Sheriff's Office had in place certain policies related to what occurred to Stefani.  Any violation of such policies by Individual Defendants working for Midland County is evidence of a constitutional violation causing, proximately causing, and/or acting as a producing cause of damages referenced in this pleading, including Stefani's death.   Thus, undisputedly, the booking supervisor on duty at the time of Stefani's incarceration had access to and, upon information and belief, knowledge of all documents in Stefani's file.

1.    Intake Policies and Procedures

117.    The Midland County jail, in addition to other policies referenced in this pleading, had in place certain written policies and procedures relating to intake and treatment of inmates at the time of Stefani's death. Post orders for the Booking Supervisor indicate that the primary functions of the Booking Supervisor is to maintain security within the booking area, manage inmates within the booking area, and update files of unhoused inmates.

118.    Jail security checks of holding cells and seating areas must be maintained and logged.  Further:

- All inmates in holding must be checked every thirty minutes, which includes a face-to-face observation of each inmate.
- Inmates in a Violent Cell, in restraints, or on a medical watch, must be checked at least every fifteen minutes.
- Any inmate on a special watch, other than the regular thirty-minute must have a medical housing sheet.

Undoubtedly, as referenced elsewhere in this pleading, Individual Defendants working for Midland County violated these written policies.  Stefani was not checked every 30 minutes by use of face-to-face observation.  All Individual Defendants working for Midland County were able to do so, and they knew that they should have done so based upon their knowledge of Stefani and her history.  Further, while the second and third listed policies should apply to Stefani, based upon

knowledge of her and her history, Individual Defendants failed to apply them. Individual Defendants completely ignored both the 30-minute observation policy and 15-minute observation policy. This was objectively unreasonable and constituted deliberate indifference.

119.    Further, it is the Booking Supervisor's responsibility to assure that inmates are medically assessed in a timely manner. The supervisor must also document all communications with medical regarding medical assessments.

120.    Post orders for the Booking Rover indicate that the primary function of the Booking Rover is management of inmate movement within the booking area. If there is no inmate movement or services within the booking area, the Booking Rover shall assist with inmate receiving. If there are no inmates to receive, the Booking Rover must assist the Booking Supervisor. These Booking Rover policies show that Individual Defendants should have worked together to protect Stefani, and not allowed her to commit suicide. Individual Defendants working at the Midland County jail could not strictly segregate their duties and be deliberately indifferent to Stefani's known mental health issues and needs.

121.    Post orders for the Receiving Officer indicate that the primary function for a Receiving Officer is to take custody of new inmates, properly search them, and process them for booking. The Receiving Officer takes custody of inmates as they are brought into the jail by an arresting officer. The Receiving Officer is not to take custody of inmates who have not completed interviews with arresting officers, and the arresting officers' processing sheet and arrest information must be complete. The Receiving Officer must complete a medical intake screening form, through the electronic version. The officer must assure that every field is complete. The Receiving Officer is to escort the inmate to the proper holding area or cell, noting housing on the top of the property sheet.

122.    The Midland County Detention Center has a written procedure regarding the Texas Commission on Jail Standards-issued intake medical and suicide screening form.  The procedure indicates that the Receiving Officer shall complete the Screening Form for Suicide and Medical and Mental Impairments. The policy requires the officer to ask the inmate all questions listed on the form, and to complete all questions "in full immediately upon admission."  If an inmate is unable to answer a question, or a question does not apply to a particular inmate, the Receiving Officer must still make a notation in the blank for the question.  If an inmate refuses to answer a question regarding mental health, depression, or suicidal attempts or thoughts, the inmate is to be treated as if the inmate answered "Yes."  Further, if an inmate cannot answer a question on a screening form for any reason, the inmate shall be placed on a suicide watch until she is able or willing to answer the question. Pursuant to Texas law, a magistrate must be notified in certain situations.  Such a situation occurs, in one instance, when an inmate is unwilling to answer or cannot answer questions on the form for any reason.  It also occurs if an inmate is intoxicated. Further, if an inmate is brought to booking to be placed on a suicide watch, an e-mail notification must be immediately sent.

123.    These policies were blatantly violated, as indicated by factual assertions detailed elsewhere in this pleading.  The Texas Commission on Jail Standards-issued medical and suicide screening form was not completed by the Receiving Officer.  The Receiving Officer did not make notations in blanks for questions which Stefani purportedly could not answer.  Further, the Receiving Officer did not treat Stefani, based upon "no" answers, as if she had answered "yes" by placing her on a suicide watch.  Regardless, Individual Defendants are inconsistent in their descriptions of Stefani, as to whether she could answer questions or not.  This is further evidence of objective unreasonableness and deliberate indifference of Individual Defendants.

2.      Medical and Mental Health Policies and Procedures

124.     The Midland County Detention Center had in place, at the time of Stefani's death, a Health Services Policy and Procedure Manual. The manual indicates that one of the policies behind its creation was to provide inmates access to care to meet serious medical needs.  One of the procedures listed in the manual, to implement this and other policies, was that inmates were to be educated at intake on the process of how to access medical care and the medical care request system.

125.     The manual also includes a section entitled, "Basic Mental Health Services."  One of the policies in that section provides that basic mental health services, defined as including crisis intervention on-site or off-site.  One policy reads, "Inmates in need of mental health services that are beyond the services provided at the facility [jail] are referred to alternative facilities for care." Further, if an inmate's condition requires mental health services beyond the scope provided at the site, i.e. in-patient psychiatric care, healthcare staff will follow established procedures to ensure each that transfer occurs in a timely manner.  Moreover, importantly, the inmate must be safely housed under appropriate observation pending transfer.  Clearly, this did not occur with regard to Stefani.

126.     Procedures in place to implement these basic mental health services policies are also identified in this section. The first listed procedure reads:

Inmates receiving mental health screening at the time of booking. Inmates identified with mental health issues are referred to mental health for further evaluation. Inmates may also access mental health by the inmate request system. If an emergency (suicidal) they may go directly to the deputy in their housing area to have medical called by phone.

In a crisis situation that correctional staff may identify at the time of booking, or the deputy assigned to the inmate's housing area may identify, they may contact medical and report to medical staff. Monday through Friday business hours mental health is responsible for following up. All other times Midland MHMR crisis team will follow

up. Contact the on-call psychiatrist 24-hours a day 7 days a week. Verbal orders can be obtained at this time.

127.    The manual also includes a section entitled "Communication on Patients Health Needs." The objective, which implicates both constitutional rights and rights under the ADA/RA, reads, "To preserve the health and safety of inmates with special medical, mental health, or developmental needs/disabilities in regard to housing, program assignments, disciplinary measures, and admissions to and transfers from the correctional institution." The objective section also contains the following definition:

**Special Needs Patients: Inmates/patients who are mentally ill or suicidal, chronically ill, physically disabled, frail or elderly, terminally ill, pregnant, on dialysis, adolescent in an adult facility, infected with a communicable disease, or developmentally disabled.**

(emphasis in original).

128.    There are several policies in this section of the manual, apparently intended to implement the stated objective. Policies relevant to claims in this case include:

- An assessment is done on every inmate/patient transferred into the correctional facility. The medical and mental health information is reviewed for any special needs in the areas of housing, work assignments, or program assignments.
- The special needs recommendations identified at intake are communicated to the correctional staff/classification department in writing via a Special Consideration form.
- Medical staff notifies the correctional staff of any medical or mental health issues that could be affected by restrictive housing related to disciplinary actions and/or segregation/isolation.

129.    The Emergency Services section of the manual provides that 24-hour mental health care is available to inmates. Further, the names, addresses, and telephone numbers of psychiatrists and mental health clinicians are supposedly posted in the Health Services Unit. The manual also provides that mental health emergencies must be housed in a safe environment and monitored to prevent harm to self or others. Mental health emergencies beyond the scope of the facility are to

be transferred to the designated mental health treatment center and/or emergency room as determined per agreement with outside facility." The procedures section includes the name and phone number of an on-call psychiatrist, and it also indicates that mental health transfers are to be sent to a hospital E.R. unless directed elsewhere.

130.    The manual also includes an Intoxication and Withdrawal section. This section contains policies and procedure for "Treatment and observation of inmates manifesting mild or moderate systems of withdrawal and/or acute intoxication." The objective section defines detoxification as being the "process by which a patient is gradually withdrawn using medical intervention." The intoxication withdrawal section contains procedures to be used on inmates such as Stefani.

131.    The manual also includes a Mental Health Screening and Evaluation section. The stated objective is that inmates identified with positive findings from a mental health screening and who are referred by security or healthcare staff must receive further evaluation by a qualified mental health professional for determination of treatment need. The policy requires:

> Qualified mental health professionals complete a comprehensive mental health evaluation on all inmates with positive findings for mental health issues, developmental disabilities, cognitive impairment, and/or substance abuse identified during the mental health screening and/or upon referral by security and/or healthcare staff. . . . Timeframe for completion of the mental health evaluation will be determined by the clinical need, but will not exceed 14 days from the date of the initial referral.

132.    The policy manual includes a Receiving Screening section, and several policies are listed. One policy indicates that Receiving Screening will be completed by a qualified healthcare professional. The Receiving Screening must take place as soon as possible after a detainee arrives at the facility. Detainees are to be screened for suicide risk, mental illness, and other medical problems. Also, such a screening will be used to determine medical clearance to incarcerate an

arrestee.  Importantly, findings of the screening are to be recorded.  Mental health screening must be completed at the time of intake.  The listed procedures are:

- Upon arrival, an officer intake is completed by correctional staff. This includes medical and mental health screening.

- CCQ form is completed and brought to medical at the end of each shift.

- A medical chart is created if the inmate does not have a previous one.

- All inmates receive a medical and mental health screening within 24-48 hours into the jail (or as soon as possible for uncooperative inmates) by a medical staff member.

- Mental Health referrals are generated as indicated.

- All medical intake screenings are reviewed with HSA or designee.

- Any inmate refused for medical or mental health issues at intake will be taken to the emergency room by the arresting agency. MDC staff will complete a refusal form. A copy goes to the HSA and the original is given to the arresting officer.

133.    As shown elsewhere in this pleading, a number of these policies seemed to be memorialized in writing but not actually reflect the customs and practices of Midland County.  Regardless, Individual Defendants failed to comply with virtually any of the policies listed in this section of the pleading above.  No Individual Defendant referred Stefani to an alternative facility for care – one required by Chapter 573.  No Individual Defendant performed a mental health screening of Stefani.  No Individual Defendant informed other personnel in the jail of Stefani's serious mental health issues and/or her hospital care the day before her arrest.  No Individual Defendant, upon information and belief, called any alleged on-call psychiatrist or other mental health professional.  There can be little doubt that Individual Defendants working at the County jail acted in an objectively unreasonable manner, and were deliberately indifferent, when failing to comply with written policies.

G.       Defendants' Knowledge and Education

       1.       Jail Suicides Are a Known Widespread Problem.

134.     Jail suicides, as Individual Defendants knew before incarcerating Stefani, are a huge problem in the United States.  One-thousand fifty-three (1,053) people died in local jails in 2014, three-hundred seventy-two (372) of which died as a result of suicide.  Individual Defendants also knew when incarcerating Stefani that most jail suicides occur by hanging/strangulation, with prisoners using objects available to them as ligatures.  Prisoners commonly use bed linens, clothing (including drawstrings), telephone cords, and trash bags.

135.     The Texas Commission on Jail Standards ("TCJS") specifies use of a screening form for suicide and medical/mental/developmental impairments.  The screening form was revised before Stefani was incarcerated to achieve, as one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line jail personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake screening "is the first step and is crucial to determine which inmates require more specialized mental health assessment."  Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."

136.     The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders.  The TCJS requires that an intake screening form be completed for all prisoners immediately upon admission into a jail facility.  Further, staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the

inmate's incarceration.  A jail must maintain any such additional screening forms in a prisoner's file.

137.    Suicides were not a novel occurrence and/or unknown issue to Individual Defendants.  They were well-aware of the risk – and Stefani's case the certainty – of suicide.  They were deliberately indifferent to this certainty, and Stefani died as a result.  Individual Defendants acted in an objectively unreasonable manner, and Midland County's and City of Midland's policies, practices, and/or customs were moving forces behind Stefani's death.

### 2.    Fifth Circuit's Long-Held Constitutional Standard:   Continuous Observation and Monitoring

138.    Nearly 30 years ago, in November 1991, the Texas Commission on Jail Standards published the Guide for Development of Suicide Prevention Plans.  Even that long ago, when society and medical professionals as a whole knew much less than they have learned over the last few years, the Commission recommended continuous observation for high risk, acutely suicidal inmates who had attempted suicide.  Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 30 years ago – in 1992 – unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit (Texas, Louisiana, and Mississippi), regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care.  **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**

**What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution.  The law was clearly established with exacting specificity, and Defendants were charged with knowledge of it.

139.    Midland County was also put on notice years before Stefani's death, in a demonstrative and visible way, of the serious risk of a person who is intoxicated committing suicide in the Midland County jail shortly after arrest.  A custodial death investigation was opened by the Texas Rangers on December 21, 2005 regarding the death of Wesley Thomas.  Midland County Sheriff's Department Sheriff Gary Painter, who was still the Sheriff at the time of Stefani's death, requested assistance from the Texas Rangers to investigate Mr. Thomas's death.  While the

Fifth Circuit does not require Plaintiff to plead the chief policymaker, upon information and belief, Sheriff Painter was the chief policymaker for the Midland County jail both at the time of the death of Mr. Thomas and at the time of Stefani's death.   Upon information and belief, Sheriff Painter failed to take any significant action to assure that such suicides would not continue.   Upon information and belief, Sheriff Painter was deliberately indifferent to the known consequences of his implementation of policy and/or failure to implement policy.   As shown elsewhere in this pleading, Sheriff Painter chose to employ at least one incompetent employee.   Unfortunately for Stefani, that incompetent employee was employed by Midland County at the time of Stefani's death, is an Individual Defendant, and engaged in conduct causing and proximately causing Stefani's death.

140.     Mr. Thomas had been booked into the Midland County jail for felony driving while intoxicated.   He was placed into a cell, like Stefani, with something that allowed him to commit suicide by hanging.   Mr. Thomas used his t-shirt to hang himself in his jail cell.   While neither Midland County nor, upon information and belief, its chief policymaker regarding the jail needed a direct object lesson – such as the death of Mr. Thomas – to change its policies, practices, and/or customs of placing an arrestee into a jail cell with the ability to kill himself, Mr. Thomas's death displayed explicitly why Stefani should have never been placed into a cell, in her intoxicated, mentally ill state, with the means with which to kill herself.

141.     In addition to Mr. Thomas's suicide in 2005, Midland County was put on notice again in 2007 with significant risk of leaving certain inmates in cells with items with which they could commit suicide.   On September 7, 2007, Texas Ranger Lieutenant Bob Bullock received a request from Midland County Sheriff Gary Painter for assistance with a death in custody at the Midland County Detention Center.   Inmate Jose Luis Lopez had hung himself while in an isolation

cell.  Mr. Lopez had been arrested the previous day by the Midland Police Department on a outstanding sexual assault warrant from Lubbock County.  Mr. Lopez was placed into an isolation cell, as a result of the charges against him, but items in the cell enabled him to form a ligature.  Mr. Lopez formed a ligature with a strip of material torn from a blanket that had been provided to him by the Midland County jail. Part of the ligature was hanging from a water control knob in the shower at the time investigators appeared at the scene after Mr. Lopez's death. This was yet another stark reminder that inmates at risk of suicide and/or other self-harm cannot be placed into a cell with items enabling such a person to commit suicide. Once again, Sheriff Painter was personally notified about the event.

142.    Moreover, it appears that the manner in which Stefani was ignored was consistent with policy, practice, and/or custom of Midland County.  This was further evidenced, aside from other allegations in this complaint, by yet another suicide occurring after Stefani committed suicide in the Midland County jail.  A custodial death report filed by Midland County with Ken Paxton, Attorney General of Texas, on June 4, 2019, reported the death of Christopher Beau Duboise.  The report indicates that Mr. Duboise appeared intoxicated by alcohol and/or drugs.  The summary portion of the report reads that, on May 23, 2019, at approximately 9:00 p.m., Mr. Duboise was brought into custody by the Midland County Sheriff's Office.  He was arrested, as was Stefani, on a public intoxication charge.

143.    Mr. Duboise was placed on a stool in booking awaiting to be received.  He then attacked another inmate who was being received.  He further refused to answer suicide screening questions.  He was thus placed on a "mental health check."  Presumably, the check was for 15-minute observations.  As pointed out elsewhere in this pleading, even 15-minute observations are insufficient to stop suicide.  Suicidal persons must be placed on constant observation.

144.    Ultimately, a jailer was able to have Mr. Duboise answer the suicide screening questions.  It appears that based simply on those answers, Mr. Duboise was moved to another cell and allowed to have clothing with which he could hang himself.  The summary indicates that, at approximately 9:55 p.m., a jailer had a face-to-face check on Mr. Duboise.  The jailer did not conduct her next check for 17 minutes.  It was then that she noticed that Mr. Duboise was in the back of the cell with a shirt tied around his neck on one end, and tied to a handicap bar on the other end.    Mr. Duboise  was  eventually  transported  by  EMS  to  Midland  Memorial  Hospital. Unfortunately, Jailer Hunnicutt was forced to – once again – ride with a person to the hospital who had committed suicide.  Moreover, once again, Judge Cobos was required to pronounce yet another inmate who committed suicide in the Midland County jail as being deceased.

145.    Thus, Midland County clearly did not have a policy, practice, and/or custom of continuously monitoring inmates and thus assuring that inmates' lives could be saved.  It is important to note the passage of less than 72 minutes time from the time that Mr. Duboise was brought into the jail until the time he was seen after he had committed suicide.  It is unreasonable at best to assume that a person who refuses to answer the suicide screening questions, and instead assaults a fellow inmate, could somehow then quickly answer those questions and prove that he was not suicidal – all within the space of less than an hour.

146.    The Texas Commission on Jail Standards, pursuant to Texas law, recently began requiring counties to report, monthly, certain categories of serious incidents occurring in county jails. One category of incidents is attempted suicides.  The Midland County jail reported, for March 2018 alone, four attempted suicides.  Upon information and belief, there were a number of attempted suicides in that jail over a lengthy period of time – years – before Stefani's completed suicide.  Thus, upon information and belief, those prior attempted suicides were further notice to

Midland County that it needed policies and procedures, and more importantly customs and practices which are actually occurring, which would prevent suicides such as Stefani's. Midland County could not employ incompetent employees and expect to save lives.

### 3.  Individual Defendants' Knowledge, Education, and Background

#### a.  Employment Records

##### (1)  Officer Blake Blanscett

147.    Officer Blanscett was hired as a police officer for the City of Midland on or about August 28, 2017. Therefore, he had been a police officer with the City for less than 10 months when he chose not to take Stefani to the nearest appropriate inpatient mental health facility or another mental health facility deemed suitable by the local mental health authority (if such an appropriate inpatient mental health facility was not available).

148.    Moreover, as of even August 2018, after Stefani committed suicide, Officer Blanscett's Midland Police Department performance appraisal indicated that he was "still a young [o]fficer who [was] settling his feet into the sand." Regardless, upon information and belief, Officer Blanscett was aware at the time he dealt with Stefani of procedures that he could use with intoxicated individuals and, upon information and belief, individuals with mental health issues (including the procedure mandated by Chapter 573 of the Texas Health and Safety Code, entitled "Emergency Detention"). In the alternative, City of Midland had not trained Officer Blanscett at all as to that statute and how he should transport a person to such a facility.

149.    Regardless, upon information and belief, before Officer Blanscett's interaction with Stefani, Midland was aware that Officer Blanscett had issues with appropriate decisionmaking when interacting with the public. His performance review also indicated the reviewer's belief that Officer Blanscett "can and will make improvements on his decisionmaking and judg[]ment as Officer Blanscett's career moves forward." One listed example of a judgment issue, was a

situation in which Officer Blanscett, after attempting to calm a female subject, decided to go "hands on." Officer Blanscett did so, even though the female subject was still hand-in-hand with a child. The reviewer noted that Officer Blanscett could have injured the child when doing so.

150. The reviewer also wrote that things that Officer Blanscett could work on was communication by word of mouth and/or problem-solving scenarios. In the job knowledge section of the 2018 performance review, the reviewer believed that it was good practice for Officer Blanscett to ride two-man with a senior officer.

151. Officer Blanscett should have never been allowed by City of Midland to interact with and handle Stefani on his own, and City of Midland knew it at the time it allowed him to patrol – solo – on the day he interacted with Stefani. City of Midland actually put into writing that it would be a good idea for Officer Blanscett to ride with a senior officer. It made such a recommendation, because it had concerns about Officer Blanscett's decisionmaking abilities. Ultimately, it was this concern, and City of Midland's failure to train and/or supervise Officer Blanscett, that was a moving force behind and proximately caused Stefani's death.

152. Officer Blanscett has also been the subject of internal investigations. One incident, occurring on March 14, 2018, involved Officer Blanscett telling an arrestee, "I'm not gonna fu**ing play with you." The senior officer indicated that Officer Blanscett's statement was unprofessional and would be addressed with his chain of command.

153. When Officer Blanscett applied to work the Midland Police Department, a background investigation was conducted in conjunction with the application process. Texas law requires such an investigation, and Officer Blanscett had to answer a series of questions. As to weaknesses, Officer Blanscett listed "nervousness" and "tunnel vision." Officer Blanscett was asked, "How well do you work under pressure?  High stress situations?"  Officer Blanscett

responded in part, "I get some tunnel vision if I don't calm down and think about the situation I'm dealing with."  The City of Midland was put on notice that it would need to supervise and train Officer Blanscett on life-and-death situations involving mentally ill people (such as Stefani).  Upon information and belief, the City did not do so.

<u>(2)     Corporal Monica Allen</u>

154.     Monica Allen, on or about June 5, 2018, gave her two-weeks' notice to resign from the Midland County Sheriff's Office.  She indicated that she was resigning to take care her new baby through the rest of the year.  Upon information and belief, that may not have been the reason for her resignation.  This view is bolstered by the fact that, just a few months before Stefani's death, on February 22, 2018, Corporal Allen requested in writing to be considered for the Jail Services Corporal position.  She stated that she had been with the Midland County Sheriff's Office four-and-a-half (4½) years at that time, and had "no plans on leaving my ever-growing career with the County."  A form filed with the Texas Commission on Law Enforcement indicates that Corporal Allen's separation with Midland County was actually the day after Stefani died – June 18, 2018.  Thus, Corporal Allen was spending her last Sunday at the jail on the day that Stefani died.

<u>(3)     Jailer Matthew Groessel</u>

155.     Interestingly, Jailer Groessel also left his employment with the Midland County Sheriff's Office in June 2018.  Jailer Groessel's resignation letter was dated June 25, 2018 – only one week after Stefani's – with a final date of employment of July 7, 2018.  Jailer Groessel indicated that he had "decided to explore other avenues of employment."  The likely logical explanation for Jailer Groessel leaving the Midland County Sheriff's Office was his actions related to Stefani's death.

156.     Three days before Stefani's suicide – on June 14, 2018 – Jailer Groessel wrote to Sheriff Painter what he termed a "formal letter of interest" in attending a law enforcement academy session.   The lengthy letter cited Jailer Groessel's alleged accomplishments with the Midland County Sheriff's Office.   There is no indication in the letter whatsoever that Jailer Groessel intended to resign his employment position.   In fact, it indicates quite the opposite.

157.     According to an application completed by Jailer Groessel seeking reemployment with the Midland County Sheriff's Office in November 2018, Jailer Groessel left his employment in June 2018 for "personal" reasons.   Upon information and belief, he likely resigned the Sheriff's Office position as a result of his failure to act appropriately with regard to Stefani.   Jailer Groessel also indicated in response to questions in or about December 2018 that he had a disciplinary write-up at the Midland County Sheriff's Office, which was removed from his file.   He also wrote that he had been the subject of a written complaint at work.

158.     Jailer Groessel had significant problems with his Midland County employment. Jailer Groessel was suspended without pay March 9 and 11, 2016.   He was suspended without pay for a disciplinary action on July 29, 2015.   He was also suspended on June 14, 2015.

(4)     Jailer George Rhea

159.     Jailer Rhea received was a long-time employee of the Midland County Sheriff's Office, originally applying in January 1988.   Jailer Rhea left his employment not long after Stefani's death, retiring on or about October 31, 2018.   Javier Rhea had significant issues with his employment with the Midland County Sheriff's Office.   Sheriff Painter's and/or others' decision to retain Jailer Rhea as an employee, and not appropriate supervise and/or train him, was a moving force behind and caused Stefani's death.

160.    Jailer Rhea received five days suspension without pay as a result of a disciplinary action taken just the month before Stefani's death – on May 29, 2018.  Jailer Rhea was to be suspended through May 9, 2018.  Jailer Rhea had been an employee of Midland County for, according to him, almost 28 years.  Jailer Rhea gave a reason for his inappropriate conduct that he had failed to take his medications.  Jailer Rhea allegedly took medication to help with his serious depression.  Jailer Rhea had used excessive force with an inmate, up to and including putting his hands around the inmate's throat, not long before Stefani's death.

161.    Jailer Rhea was promoted to jailer on Sunday, September 17, 2017.  Upon information and belief, this was his third promotion to jailer.  Upon information and belief, he had been promoted to jailer two times before, and then demoted each time.

162.    Jailer Rhea was assigned "B" Shift – to Booking.  This is the shift during which Stefani was brought to the Midland County jail.  After that promotion, Jailer Rhea wrote a letter to Sheriff Painter.  He wrote in his letter that it had been brought to his attention that he could be a liability to the Sheriff and the office.  He had been diagnosed with a mental condition known as "spiraling depressing."  This resulted in him engaging in arguments, to the point of outright insubordination – with supervisors and leadership appointed over him.  He said that there was documentation and accounts of such actions – resulting in disciplinary actions in his personnel file in the Midland County administration office.  "I had been advised – upon my promotion – to submit a letter of request to purge those particular records and documents from my personal [sic] file that would deem me as a possible threat."  Therefore, even though Midland County knew that it should not have entrusted Jailer Rhea with Stefani's life, it chose to do so.  Jailer Rhea should not have been allowed to conduct Stefani's intake, holding her life in his hands.  The decision to

retain Jailer Rhea through significant problems and promotions – and then demotions – was made by, upon information and belief, the jail's chief policymaker – Chief Painter.

163.    There were other significant issues with Jailer Rhea's employment, which were apparently known to everyone.  In one letter that he wrote, he admitted that he had been demoted twice before:

> I realize that over a quarter of a century has passed with my employment here for you, and during that time I have spent all of it as a Jail Clerk. I also realize that twice before I had been promoted to the position of jailer, and have been relieved of the position and kept at the position of Jail Clerk. Thus, after nearly 30 years at the Midland County Sheriff's Office, I had been promoted from a clerk only twice and demoted both such times.

The apparent decision to promote Jailer Rhea a third time to jailer resulted in, caused, was a proximately cause of, was a producing cause of, and was a moving force behind Stefani's death.

164.    Jailer Rhea's attitude toward pre-trial detainees was not consistent with societal or jail norms and standards, but more importantly the United States Constitution.  Pre-trial detainees have not been convicted of anything and must be treated as such.  The Constitution prohibits punishment of such people in any way, since they have not been convicted.  They enjoy a presumption of innocence.  They must receive reasonable medical care and mental health care, and they must be protected from themselves and others.  However, Officer Rhea had an attitude toward such pre-trial detainees inconsistent with the Constitution and inconsistent with views and norms of all competent jailers.  He demonstrated such attitudes when he completed a form to be used to demonstrate use of the form to other Midland County jail employees.

**Midland County Sheriff Office**
**Detention Division Authorized Visitor List**
and
**Child Disclaimer Visitation Liability Release**

Inmate's Name _Youra Konvict_       Name Number _2XXXXX_

1. Visitor's Name: _Lori No one_       Relationship: _girlfriend_
2. Visitor's Name: _Ima Konvict_       Relationship: _Mom_
3. Visitor's Name: _Sheila Konvict_       Relationship: _Sister_
4. Visitor's Name: _Eine Mate_       Relationship: _Cusin_
5. Visitor's Name: _____       Relationship: _____

By signing below I acknowledge that the people listed above are authorized to visit me and that anyone not on the above list will **not** be allowed to visit with me. I also understand that changes can be made to the above list at my request, but that all requests must be made in writing to the jail administration and must be approved by the jail administration.

Inmate's Signature: _Youra Konvict_       Date: _06-01-11_
Witness: _Jay L. Clerk_       Date: _6/1/11_

I, Gary Painter, Sheriff of Midland County, am not in agreement with that portion of the Texas Commission on Jail Standards rule #291.4(4) Inmate Visitation Plan which states "provide procedures for the selection of visitors, **including inmate's minor children.** Accompaniment by parent, guardian, or legal counsel may be required." It is my opinion that this rule coerces Midland County and me to allow children in the confines of the detention facility.

I, _Youra Konvict_ , am aware of Sheriff Gary Painter's protest of the Texas Commission on Jail Standards rule forcing the Midland County Sheriff's Office to allow children into the detention facility for the purposes of visitation, and, by signing agree that my (circle one)   spouse   (children's parent)   legal guardian   of my children listed and signed below to supervise and control the children listed while in the confines of said facility. Furthermore, we agree to waive any and all liability of the County of Midland, Texas, its elected officials, and employees for any harm, injury, or sickness to the children that result from the visit within the detention facility.

Name of spouse, parent, or legal guardian: _Lori No one_

Signature: _Youra Konvict_       Date: _06-01-11_
Witness: _Jay L. Clerk_       Date: _6/1/11_

Child's Name: _Younger Konvict - son_       DOB: _03-15-09_
Child's Name: _Meaner Konvict - son_       DOB: _02-30-10_
Child's Name: _Amy No one - stepdotter_       DOB: _11-12-03_
Child's Name: _____       DOB: _____

165.    One need say little after reading Jailer Rhea's written comments on the form. Sufficient it to say that Jailer Rhea assumed that pre-trail detainees were convicted criminals, and that their younger children would follow in their footsteps.  Upon information and belief, this view colored Jailer Rhea's treatment of Midland County jail inmates.  More importantly, it informed and supported his unconstitutional treatment of Stefani.

166.    Jailer Rhea had also been suspended without pay for a disciplinary action taken on May 1, 2008.  In 2009, Captain Terrisa Candelaria received a termination request for then-Clerk Rhea from Lieutenant Soledad Gonzalez.  Officer Candelaria acknowledged that "Clerk Rhea has exhibited unprofessional conduct in the workplace to Sheriff Painter.



RECEIVED

MAY 2 6 2009

MCSO—ADMIN.

**MIDLAND COUNTY SHERIFF'S OFFICE**
P.O. Box 11287
MIDLAND, TEXAS 79702

GARY PAINTER
Sheriff

ED KREVIT
Chief Deputy

April 30, 2009

Terrisa Candelaria, Captain
Midland County Sheriff's Department
P. O. Box 11287
Midland, TX 79702

**REF: Clerk Darrell Rhea**

Dear Captain;

On Tuesday, April 28, 2009, Sergeant Candy Henry gave Clerk Rhea a directive and he refused to comply.

The following is a list of altercations with Clerk Rhea involving supervisors and staff. Areas of great concern are the extreme anger and hostile reactions that both supervisors and staff have had to encounter and witness concerning Clerk Rhea:

June 30, 2006 – Clerk Rhea was counseled due to an altercation with Sergeant Kessler.
February 10, 2007, Clerk Rhea became upset because his request for day off was not approved and threw a coke at the wall resulting in Sergeant Tom Elder having to send him home due to Clerk Rhea being so upset and shaken (Received written reprimand).
April 25, 2008 – Clerk Rhea received three (3) day suspension due to an altercation with Sergeant San Miguel because he was going to have to work overtime.
October 2, 2008 Clerk Rhea was relieved from duty by Sergeant Henry and sent home due to him being upset about a mistake that needed to be corrected.
November 11, 2008 I counseled with Clerk Rhea regarding offensive pictures and was mandated to see his family doctor (Dr. Best) and Dr. Kock (Psychiatrist) to evaluate due to his history of bad temperament and the concern of supervisors and co-workers that are afraid of his outbursts.

Clerk Rhea has a tendency to lash out in a very violent and uncontrollable manner.
I have tried to help Clerk Rhea but his disrespect to authority has become a problem to where supervisors and co-workers feel they have to walk on egg shells around him.

Although it pains me greatly, I feel I have no other recourse but to request termination as I feel that employees and supervisors should not have to work and fear a hostile outbreak from Clerk Rhea.

Sincerely,

Soledad Gonzalez, Lieutenant
MCSO

XC:    Clerk's File
       File

167.    Jailer Rhea's personnel file is replete with significant material problems which should have resulted in termination long before his interaction with Stefani in June 2018. He did not possess reasonable decision-making abilities. He could not get along with co-workers. He had been promoted, and then demoted twice. He had an attitude toward pre-trial detainees which is not consistent with their rights under the United States Constitution. Sheriff Painter then apparently decided to promote him a third time, which unfortunately caused and was a moving force behind Stefani's death.

b.    TCOLE Records

168.    The Texas Commission on Law Enforcement ("TCOLE") keeps records of service histories and training and education of the natural person Defendants and which relates to law enforcement and/or jailer activities. TCOLE records indicate that each of the natural person Defendants had sufficient experience and/or education to be fully aware that a failure to act reasonably and/or being deliberately indifferent, would violate Stefani's rights under the United States Constitution.

169.    TCOLE records indicate the following service history for Jailer Rhea:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|

| Jailer (Full Time) | Midland County Sheriff's Office | Jailer License | 04/26/18 | 10/31/18 |
| Jailer (Full Time) | Midland County Sheriff's Office | Temporary Jailer License | 09/17/17 | 04/26/18 |

170.    TCOLE records indicate the following award history for Jailer Rhea:

| Award | Type | Action | Action Date |
|-------|------|--------|-------------|
| Temporary Jailer License | License | Granted | 09/17/17 |
| Jailer License | License | Granted | 04/26/18 |

171.    TCOLE records indicate that Jailer Rhea received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|------------|--------------|-------------|--------------|-------------|
| 4900 | Mental Health Training for Jailers | 04/25/18 | 8 | Permian Basin LEA |
| 1007 | Basic County Jail Course | 04/25/18 | 96 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/05/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/04/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/03/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/02/18 | 1 | Permian Basin LEA |
| 3500 | Jail | 07/28/97 | 4 | Permian Basin LEA |

172.    TCOLE records indicate the following service history for Jailer Groessel:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|--------------|------------|-------|--------------------|--------------------|
| Jailer (Full Time) | Midland County Sheriff's Office | Jailer License | 12/22/18 | |
| Jailer (Full Time) | Midland County Sheriff's Office | Jailer License | 08/26/15 | 06/25/18 |
| Jailer (Full Time) | Midland County Sheriff's Office | Temporary Jailer License | 09/11/14 | 08/26/15 |

173.    TCOLE records indicate the following award history for Jailer Groessel:

| Award | Type | Action | Action Date |
|-------|------|--------|-------------|

| | | | |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 09/11/14 |
| Jailer License | License | Granted | 08/26/15 |
| Basic Jailer | Certificate | Issued | 08/27/15 |

174.    TCOLE records indicate that Jailer Groessel received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 2084 | Jail/Correction Inservice | 01/04/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/03/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/02/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 09/30/16 | 40 | Permian Basin LEA |
| 4040 | Mental Impairment (General) | 03/03/16 | 4 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 12/18/15 | 40 | Permian Basin LEA |
| 1007 | Basic County Jail Course | 08/25/15 | 96 | Permian Basin LEA |
| 3721 | County Correction Officer Filed Training | 10/08/14 | 160 | Midland Co. Sheriff's Office (Training Rosters) |

175.    TCOLE records indicate the following service history for Jailer Allen:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer | Midland County Sheriff's Office | Jailer License | 09/04/14 | 06/18/18 |
| Jailer (Full Time) | Midland County Sheriff's Office | Temporary Jailer License | 12/18/13 | 09/04/14 |

176.    TCOLE records indicate the following award history for Jailer Allen:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 12/18/13 |
| Jailer License | License | Granted | 09/04/14 |

177.    TCOLE records indicate that Jailer Allen received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3737 | New Supervisor's Course | 02/23/18 | 20 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/05/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/04/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/03/18 | 1 | Permian Basin LEA |
| 2084 | Jail/Correction Inservice | 01/02/18 | 1 | Permian Basin LEA |
| 4040 | Mental Impairment (General) | 03/01/16 | 4 | Permian Basin LEA |
| 1007 | Basic County Jail Course | 09/03/14 | 96 | Permian Basin LEA |
| 1071 | Basic County Corrections Classroom Component | 08/08/14 | 24 | Permian Basin LEA |

178.    TCOLE records indicate the following service history for Officer Blanscett:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Full Time) | Midland Police Department | Peace Officer License | 09/07/17 | |

179.    TCOLE records indicate the following award history for Officer Blanscett:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Peace Officer License | License | Granted | 09/07/17 |
| Basic Peace Officer | Certificate | Certification | 08/23/18 |

180.    TCOLE records indicate that Officer Blanscett received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3270 | Human Trafficking | 05/07/18 | 4 | Permian Basin LEA |
| 3925 | Law Enforcement Distance | 05/04/18 | 4 | TCOLE Online |
| 3722 | Peace Officer Field Training | 12/21/17 | 160 | Midland Police Department (Training Rosters) |
| 1000643 | Basic Peace Officer Course (643) | 08/09/17 | 643 | South Plains College Academy |

H.      *Monell* Liability of Midland County and City of Midland

        1.      Introduction

181.    Plaintiff sets forth in this section of the pleading additional facts and allegations supporting liability claims against Midland County and City of Midland pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978).  It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of Midland County and City of Midland support such *Monell* liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and/or customs alleged in this pleading were moving forces behind and caused the constitutional violations and damages and death referenced herein.

182.    Midland County knew, when it incarcerated Stefani, that its personnel, policies, practices, and/or customs were such that it could not meet its constitutional obligations to provide appropriate mental health treatment to Stefani.  Midland County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of Midland County as it related to its jail.  The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the specific identity of Midland County's chief policymaker.

183.    City of Midland knew, when it allowed Officer Blanscett, without supervision, to arrest Stefani, that its personnel, policies, practices, and/or customs were such that it could not meet its constitutional obligations to provide appropriate mental health treatment to Stefani.  Upon information and belief, City of Midland made decisions about policy and practice which it implemented through its city council, its chief of police, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of City of Midland as it related to arrest and/or transport of people who presented as intoxicated and/or had significant mental health issues.  The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the specific identity of City of Midland's chief policymaker.

184.    There were several policies, practices, and/or customs of Midland County and/or City of Midland which were moving forces behind, caused, were producing causes of, and/or proximately caused Stefani's suffering and death, and other damages referenced in this pleading. The County and City made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County and City implemented and/or consciously allowed such policies, practices, and/or customs to exist, they knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.    Midland County Sheriff's Office Culture

185.    David Criner, as of approximately March 2020, became Midland County's first newly-elected Sheriff in over thirty years.  Newly-elected Sheriff Criner indicated that the first action he will take as Sheriff is to resolve ongoing Texas Rangers investigations into the Midland County Sheriff's Office.  He said that he wanted the Office to start "with a new sheet of paper and go forward from there."  Sheriff Criner said, "It's important for Midland County itself, the citizens of Midland County, and also the employees of the Midland County Sheriff's Office, because right

now, there's a dark cloud over the sheriff's office."  Newly-elected Sheriff Criner also admitted

that the jail's mental health unit has only been operating eight hours per day – on weekdays.  Thus,

it was not operating on the Sunday when Stefani committed suicide.  Moreover, upon information

and belief, before Sheriff' Criner's election, the Midland County Sheriff's Office was being

investigated for alleged unlawful interception of oral or electronic communications, abuse of

official capacity, and/or tampering with a governmental record and theft.

186.    It appears that the Midland County jail has had problems for quite some time.  Even

after the suicides and suicide attempts refereed in this complaint, the Midland County jail failed a

Texas Commission on Jail Standards inspection in early year 2020.

### 3.    Midland County Liability

187.    Plaintiff lists beneath this heading policies, practices, and/or customs which

Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing

causes of, and/or were moving forces behind all damages referenced in this pleading, including

Stefani's death.  Thus, Midland County is liable for all such damages.

188.    Upon information and belief, the Midland County jail was understaffed at critical

times, such as the time when Stefani committed suicide.  Corporal Allen indicated that the jail was

shorthanded on the Sunday on which Stefani committed suicide.

189.    Upon information and belief, there was a custom and/or practice of not completing

the TCJS-required mental health screening form for inmates who were intoxicated.  Evidence

supporting such an allegation includes that of Jailer Rhea – a long time employee of the Midland

County Sheriff's Office – asserting that he would allow Stefani just to "sleep it off."  Upon

information and belief, this was a consistent practice and/or custom.  Upon information and belief,

the Midland County Sheriff's Office also had a practice and/or custom of intake officers not

communicating to other people in the intake area and/or jail when the TCJS-required intake screening form was not completed.

190.    Upon information and belief, Midland County also had a policy, practice, and/or custom of not providing suicide smocks to inmates who were suicidal and/or exhibited self-harm tendencies.  There was no evidence in documents received related to Stefani's death indicating that such a suicide smock was ever considered.  Suicide smocks are designed to not be able to be used by inmates to asphyxiate and/or otherwise harm themselves.

191.    Upon information and belief, Midland County had a policy, practice, and/or custom which did not require jailers working in Master Control to continuously watch inmates.  Upon information and belief, such persons were easily able to view on a monitor what was occurring in cells in the intake area, including Stefani's cell.

192.    Upon information and belief, Midland County Sheriff's Office did not have – for quite some time – a computer in the booking area which would allow the viewing of inmates in cells in that area.  As shown above, there was a computer in that area which would allow such viewing, but it was not working at the time of Stefani's death.  Upon information and belief, possibly had not been working for quite some time.

193.    Upon information and belief, the Midland County Sheriff's Office had a policy, practice, and/or custom of allowing observations and/or checks of inmates in the booking area without actual face-to-face observation.  This is evidenced by the fact that a jailer responsible for observing Stefani was able to clearly shirk responsibilities without anyone else in the area saying anything to him about the manner in which he was purportedly conducting cell checks walking by a cell door and/or making a cursory viewing through a cell window is not a "check" consistent with jail standards and/or TCJS minimum standards.

194.     Upon information and belief, the Midland County Sheriff's Office had a practice, policy, and/or custom of allowing a nurse, potentially not trained in mental health issues, to simply ask cursory questions about a person who had taken a number of pills and not requiring after such cursory questioning questioning by mental health professionals and/or others.  This resulted in Stefani being placed into a cell so that she could commit suicide.  The conversation between the nurse and Stefani, if true as represented in documents produced by Midland County, is not a medical and/or mental health evaluation at all.

195.     Midland County Sheriff's Office only provided on-site mental health care Monday through Friday.  This policy, practice, and/or custom did not allow Constitutional duties to be met by Midland County on weekends – specifically on the Sunday when Stefani died.

196.     Midland County, upon information and belief through its chief policymaker sheriff, chose over an extended period of time to retain Jailer Rhea as an employee.  As shown in this complaint, Jailer Rhea was unfortunately not competent to perform his duties, having been demoted twice, and demonstrating in his own letter to the Sheriff that he was a "liability" to the jail.

### 4.      City of Midland Liability

197.     Plaintiff lists beneath this heading policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including Stefani's death.  Thus, City of Midland is liable for all such damages.

198.     Upon information and belief, the City of Midland had a policy, practice, and/or custom of not requiring that arrestees be taken to a local inpatient facility for mental health treatment in accordance with Chapter 573.  There appears to be no discussion regarding Stefani being taken to a local inpatient facility at the time Stefani was delivered to the Midland County

jail and/or is evidenced by records produced by City of Midland. Moreover, upon information and belief, City of Midland policies in place at the time of Stefani's arrest, for conducting arrests and seizures, made no provision for – and did not even mention – transport of a mentally ill person to an inpatient mental health facility. Thus, upon information and belief, Midland written policies made no provision for Chapter 573.

199. Upon information and belief, City of Midland had not, in the alternative to other allegations made in this pleading, trained Officer Blanscett about Chapter 573, and its application. This is an alternative allegation, to the extent Officer Blanscett indicates that he did not receive such training. In the alternative, if he did receive such training, this is further evidence of his deliberate indifference and objective unreasonableness toward Stefani's significant mental health issues.

200. City of Midland failed to appropriately supervise and/or, upon information and belief, train Officer Blanscett. City of Midland knew about Officer Blanscett's inexperience, and even noted that it would be good for a senior officer to ride with him in the field. Even so, City of Midland did not require that such a senior officer ride with Officer Blanscett.


III.     Causes of Action

A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

201. In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was

*objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

202. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

203. It appears that this objective reasonableness standard is now the law of the land. In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id.* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting

under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit

Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate

indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

204.     The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*.  First, the panel was bound by the Fifth Circuit's "rule of orderliness."  *Id.* at 420 n.4.  Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims.  *Id*.  Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*.  *Id.*  Even so, the Fifth Circuit noted, nearly twenty-five years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases.  *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

205.     Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a non-convicted plaintiff should have such a burden.

B.     Remedies for Violation of Constitutional Rights and Other Federal Claims

206.     The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually, and for and on behalf of Claimant Heirs, seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.

If Stefani had lived, she would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution, and actions for violation of the Americans with Disabilities Act and Rehabilitation Act, and obtain remedies and damages provided by Texas and federal law. Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

C.   Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process and/or 4th Amendment Rights to Reasonable Mental Health Care, to be Protected, and not to be Punished

207.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiff individually and to Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Stefani's rights to reasonable mental health care, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by the 4th and/or 14th Amendments to the United States Constitution. Pre-trial detainees are entitled to a greater degree of medical and mental health care than convicted inmates, according to the Fifth Circuit Court of Appeals. Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

208.   Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading. They wholly or substantially ignored Stefani's obvious serious mental health issues and/or self-harm tendencies, and they were deliberately indifferent to and acted in an objectively unreasonable manner those needs. They failed to protect Stefani, in their arrest and/or incarceration of her, and placement of her into a cell to die alone after knowing about her serious

mental health and self-harm issues, as well as other actions and/or inaction referenced in this pleading, resulted in unconstitutional punishment of Stefani. Individual Defendants were aware of the excessive risk to Stefani's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death. Moreover, they in fact drew that inference. Individual Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.

209.    Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements. All Individual Defendants, regardless of their rank or employer, had a duty and an obligation to assure that Stefani was transported to an appropriate inpatient mental health facility and/or to call serious attention to her issues, to such Individual Defendants' employer, regarding Stefani's issues. They chose not to do so. Therefore, Individual Defendants are also liable to Plaintiff individually and Claimant Heirs pursuant to this theory.

210.    In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and constitutional rights affording

pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause.  *Id.*  Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

211.   Individual Defendants are not entitled to qualified immunity.[2]  Their denial of reasonable mental health care, and other actions and/or inaction set forth in this pleading, caused,

---

[2]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

The natural person Defendants cannot show that they would fall within the category of persons referenced in the second sentence of this footnote.  This would be Defendants' burden, if they choose to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99.  *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting).  Additionally, qualified immunity violates the separation of powers doctrine of the Constitution.  *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

proximately caused, and/or were producing causes of Stefani's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff and Claimant Heirs.

212.    Therefore, Stefani's estate and/or her heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants:

- Stefani's conscious physical pain, suffering, and mental anguish;

- Stefani's medical expenses;

- Stefani's funeral expenses; and

- exemplary/punitive damages.

213.    Plaintiff and Claimant Heirs also individually seek and are entitled to all remedies and damages available to each such person individually for 42 U.S.C. § 1983 claims.  Plaintiff seeks such damages as a result of the wrongful death of her son; Richard Gonzales seeks such damages for the wrongful death of his wife; and Hayden Palacios, Mackenzie Clarty, Madison Flemons, K. G. (son), and K. G. (daughter) seek such damages due to the wrongful death of their mother.   Those damages were caused and/or proximately caused by Individual Defendants. Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Plaintiff would have received from Stefani;

- expenses for Stefani's funeral;

- past mental anguish and emotional distress suffered by Plaintiff and Claimant Heirs resulting from and caused by Stefani's death;

- future mental anguish and emotional distress suffered by Plaintiff and Claimant Heirs resulting from and caused by Stefani's death;

- loss of companionship and society that Plaintiff and Claimant Heirs would have received from Stefani; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Stefani's constitutional rights. Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Stefani's rights and safety. Moreover, Plaintiff individually, and also on behalf of Claimant Heirs, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

     D.     Cause of Action Against Midland County and City of Midland Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process and/or 4th Amendment Rights to Reasonable Mental Health Care, to be Protected, and not to be Punished

214.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Midland County and City of Midland are liable to Plaintiff and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Stefani's rights to reasonable mental health care, to be protected, and not to be punished as a pre-trial detainee. These rights are guaranteed by the 4th and/or 14th Amendments to the United States Constitution. Pretrial detainees are entitled to a greater degree of medical and mental health care than convicted inmates, according to the Fifth Circuit Court of Appeals. They are also entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

215.     Midland County and City of Midland acted or failed to act, through natural persons including Individual Defendants, under color of State law at all relevant times. Midland County's

and/or City of Midland's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Stefani's suffering, damages, and death, and the damages suffered by Plaintiff and Claimant Heirs.

216.     The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of Midland County was the relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the Midland County jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, Midland County's commissioners' court was the relevant chief policymaker. Moreover, as to City of Midland, the city council was the relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the chief of police for City of Midland was the relevant chief policymaker over matters at issue in this case.

217.     Midland County and City of Midland were deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  They also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Stefani's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Midland County's and/or City of Midland's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Stefani.

218.     Therefore, Stefani's estate and/or her heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Midland County and/or City of Midland:

- Stefani's conscious physical pain, suffering, and mental anguish;

- Stefani's medical expenses; and

- Stefani's funeral expenses.

219.    Plaintiff and Clamant Heirs also individually seek and are entitled to all remedies and damages available to each such person individually for the 42 U.S.C. § 1983 violations. Plaintiff seeks such damages as a result of the wrongful death of her son; Richard Gonzales seeks such damages for the wrongful death of his wife; and Hayden Palacios, Mackenzie Clarty, Madison Flemons, K. G. (minor son), and K. G. (minor daughter) seek such damages due to the wrongful death of their mother.  Midland County's and/or City of Midland's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Plaintiff would have received from Stefani;

- expenses for Stefani's funeral;

- past mental anguish and emotional distress suffered by Plaintiff and Claimant Heirs resulting from and caused by Stefani's death;

- future mental anguish and emotional distress suffered by Plaintiff and Claimant Heirs resulting from and caused by Stefani's death; and

- loss of companionship and society that Plaintiff and Claimant Heirs would have received from Stefani.

Moreover, Plaintiff individually, and on behalf of Claimant Heirs, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

E.    Causes of Action Against Williamson County and/or City of Midland for Violation of Americans with Disabilities Act and Rehabilitation Act

220.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Midland County and/or City of Midland are liable to Plaintiff and/or Claimant Heirs pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.  Upon information and belief, Midland County and/or City of Midland have been and are recipients of federal funds.  Therefore, they are covered by the mandate of the federal Rehabilitation Act.  The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose.  Further, Title II of the ADA applies to Midland County and/or City of Midland and has the same mandate as the Rehabilitation Act.  Claims under both the Rehabilitation Act and ADA are analyzed similarly.

221.    The Midland County jail is a "facility" for purposes of both the rehabilitation and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes.  Stefani was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of her major life activities.  Stefani was therefore disabled.  Upon information and belief, Stefani was also discriminated against by reason of her disability.

222.    A majority of circuits have held, for purposes of Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate indifference.  The Fifth Circuit has, as yet, declined to follow the majority view. Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

223.    Midland County's and/or City of Midland's failure and refusal to accommodate Stefani's mental and/or medical disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Stefani's suffering and death and Plaintiff s and Claimant Heirs' damages.

224.    Midland County's and City of Midland's violations of the Rehabilitation Act and the ADA included the failure to reasonably modify facilities, services, accommodations, and programs to reasonably accommodate Stefani's disabilities.  These failures and refusals, which were intentional, proximately caused Stefani's damages and death, and Plaintiff's and Claimant Heirs' damages.  Because Stefani's death resulted from Midland County's and/or City of Midland's intentional discrimination against her, Plaintiff and Claimant Heirs are entitled to the maximum amount of compensatory damages allowed by law.  Plaintiff and Claimant Heirs seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of Plaintiff's and Claimant Heirs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and the ADA, and Plaintiff and Claimant Heirs also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

IV.    Concluding Allegations and Prayer

    A.    Conditions Precedent

225.    All conditions precedent to assertion of all claims herein have occurred.

    B.    Use of Documents at Trial or Pretrial Proceedings

226.    Plaintiff and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests,

with initial disclosures (and any supplements or amendments to same), and in response to Public

Information Act request(s).


C.      Jury Demand

227.    Plaintiff and Claimant Heirs demand a jury trial on all issues which may be tried to

a jury.

D.      Prayer

228.    For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and

that Plaintiff (Angela Janell Burrows) and Claimant Heirs (Richard Gonzales, Hayden Palacios,

Mackenzie Clarty, Madison Flemons, K. G. (minor son), and K. G. (minor daughter) have

judgment for damages within the jurisdictional limits of the court and against all Defendants,

jointly and severally, as legally available and applicable, for all damages referenced above and

below in this pleading:

   a)    actual damages of and for Angela Janell Burrows, individually and as administrator
         of the referenced estate; and Richard Gonzales, Hayden Palacios, Mackenzie
         Clarty, Madison Flemons, K. G. (minor son), and K. G. (minor daughter), including
         but not necessarily limited to:

         •      loss of services that Plaintiff would have received from Stefani;

         •      medical expenses for Stefani;

         •      expenses for Stefani's funeral;

         •      past mental anguish and emotional distress resulting from and caused by
                Stefani's death;

         •      future mental anguish and emotional distress resulting from and caused by
                Stefani's death;

         •      Stefani's conscious physical pain, suffering, and mental health anguish; and

         •      loss of companionship and society that they would have received from
                Stefani;

b)      exemplary/punitive damages for Plaintiff and Claimant Heirs, from Individual Defendants (George Darrell Rhea, Matthew Francis Groessel, Monica Marie Allen, and Blake Allen Blanscett);

c)      reasonable and necessary attorneys' fees for Plaintiff and Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiff and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


_____/s/ T. Dean Malone_____
    T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:       (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:       (214) 670-9904

Attorneys for Plaintiff